IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MAURICE L. WALLACE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 17-cv-0576-DWD |
| | ) |
| **KIM BUTLER,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Maurice Wallace, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated in Menard Correctional Center ("Menard"), brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"). Before the Court is Plaintiff's Motion for Preliminary Injunction related to Plaintiff's potential release from segregation.[1] (Doc. 170). The Defendants filed a Response in opposition. (Doc. 188). An evidentiary hearing on the Motion was held on January 19, 2021.

---

[1] The parties use various other terms for the housing arrangement—Plaintiff prefers "solitary confinement" while IDOC has recently adopted the terminology of "restrictive housing." In modern Seventh Circuit and Illinois jurisprudence, the term "segregation" is most commonly used, and the Court will continue to use that term until the Seventh Circuit directs otherwise.

Supplemental briefing was submitted by each side as well. (Docs. 208 and 209). Plaintiff's Motion is **DENIED**.

## Factual Background

Plaintiff has been held in segregation since 2006, and Plaintiff filed this case in part seeking his release from segregation. (Doc. 152, p. 40). In 2020, IDOC informed Plaintiff and his counsel that he would be scheduled for release into the general population in December 2020. (Doc. 171, p. 4). IDOC's plan for transitioning Plaintiff appears to involve a six-week program, during which Plaintiff will have 90 minutes twice per week in general population and a one-day seminar course on life skills. (Ex. A, Slide 4). It also provides for removal from the transition program for disciplinary infractions. (*Id.*, Slide 6).

Defendants state that Plaintiff has been seeing an on-site clinical social worker (Carri Morris) on a bi-monthly basis since July 2020 in preparation for the transition to general population. (Doc. 188, p. 4). These half-hour to hour-long sessions focus on Plaintiff's transition, including "coping mechanisms and techniques for dealing with anxiety and high stress." (*Id.*). Plaintiff is also permitted to leave his cell for certain other activities. (*Id.*, p. 5). Plaintiff, who is designated Seriously Mentally Ill ("SMI"), also has monthly appointments with a clinical psychiatrist, Dr. Poteat. (*Id.*). Additionally, Menard staff have formulated a Mental Health Master Treatment Plan ("Treatment Plan"), which outlines the specifics of Plaintiff's mental health interventions. (Doc. 193).

Plaintiff is expected to remain in a single-occupancy cell during his transition, and to continue being seen by Morris after being placed in general population. (Doc. 188., pp. 5-6). Additionally, IDOC has promulgated a new policy requiring an individualized "transition and stabilization plan" for offenders moving from restrictive housing to general population, developed by a Restrictive Housing Review Committee comprised of medical, security, clinical, mental health and administrative staff. (*Id.*, p. 5).

Major Rowland provided testimony that he oversees the North 2 cellhouse where Plaintiff is housed and has known him since 2006. (Doc. 207, p. 17). He prepared a Restrictive Housing Transition and Stabilization Plan ("Transition Plan") for Plaintiff in consultation with Morris. (*Id.*, pp. 21-22). Under the Transition Plan, Plaintiff was moved within North 2 from disciplinary segregation to a larger administrative detention cell. (*Id.*, p. 22). This was considered advantageous because of Plaintiff's familiarity with North 2 staff, and the Transition Plan calls for him to remain single-celled during the transition. (Preliminary Injunction Hearing Exhibit 2). The Transition Plan also requires Plaintiff to attend group therapy sessions, be seen by a mental health professional ("MHP") regularly, and complete a number of programs such as Anxiety Management, Conflict Resolution and Anger Management. (*Id.*). A description provided to Plaintiff by Morris defines successful completion as at least 90% attendance, active engagement and participation. (Preliminary Injunction Hearing Exhibit 3). Were he to get a disciplinary ticket during the transition program, Major Rowland testified that he would

not be moved back to segregation but would remain in the administrative detention cell for whatever penalty time he was required to serve. (Doc. 207, pp. 32-33).

Carri Morris testified that she did not have any special training on the effects of segregation on prisoners other than internal PowerPoint presentations. (Doc. 207, p. 38). Rowland and Morris each testified that Plaintiff's Transition Plan was created without consultation with any physicians or psychiatrists. (*Id.*, pp. 36-37). Morris did consult with her supervising psychologist, Dr. Reister, on transition plans in general. (*Id.*, p. 45). Morris also testified that the programs she selected for Plaintiff's Transition Plan were formulated or approved by Wexford Health Sources, but that she had not vetted them with a psychiatrist or psychologist. (*Id.*, p. 43).

Plaintiff submitted an unsigned report from his retained expert, Dr. Stuart Grassarian. (Doc. 176). The report discusses in some depth the overall psychological effects long-term segregation or solitary confinement can have on prisoners, and the psychological effects prolonged segregation has had on Plaintiff in particular. Dr. Grassian is a psychiatrist and was recognized without objection as an expert on the psychological effects of solitary confinement on prisoners in general. (Doc. 207, pp. 53-55, 59). He interviewed Plaintiff twice in 2019 regarding his specific situation. (Doc. 207, pp. 56-57)

Dr. Grassian testified at some length regarding Plaintiff's current psychological issues, including suicidality, major depression, auditory hallucinations telling him it is

"kill or be killed," threatening visual hallucinations and "vaguely delusional thinking[.]" (Doc. 207, pp. 59-61). He agreed that returning Plaintiff to general population without a transition program would be extremely harmful. (*Id.*, p. 61). He described the important features of such a "step-down" program for transition as normalizing the experience in a group setting, gradual introduction and increase in structured and unstructured activities, very frequent interactions regarding a prisoner's feelings on progress, and the ability to go back to their cell when they feel overwhelmed. (*Id.*, pp. 62-63).

When asked about the Transition Plan, Dr. Grassian characterized it as "too basic[.]" (Doc. 207, p. 63). He took specific issue with the 90% program attendance requirement could be counterproductive, as it would effectively penalize Plaintiff for engaging in a necessary behavior (exiting or avoiding public situations when feeling overwhelmed). (*Id.*, pp. 63-65). Dr. Grassian also suggested that the types of therapy mandated for Plaintiff (Rational Emotive Behavior Therapy ("REBT") and Cognitive-Behavioral Therapy ("CBT")) are "not terribly appropriate" for Plaintiff's issues, though he indicated that he was "not saying they're 100 percent inappropriate[.]" (*Id.*, p. 65). Dr. Grassian opined that if Plaintiff is put in a situation where he is overwhelmed and cannot get away from it, his mental condition could be substantially harmed. (*Id.*, p. 68). He acknowledged that there are different ways to successfully implement a step-down process, and that he does not have the expertise to design one. (*Id.*, pp. 68-69).

In post-hearing briefing, Plaintiff submitted two scholarly articles and a press release. (Doc. 209-1, pp. 16-51). The first, entitled "Step-Down Programs and Transitional Units: A Strategy to End Long-Term Restrictive Housing" was issued by the Vera Institute of Justice, a private non-profit group. The article focuses primarily on best-practices, identifying five "key aspects" to an effective transition program:

1. Individualized decisions about who is placed in the program;

2. Conditions that differ significantly from restrictive housing;

3. Meaningful out-of-cell group programming and activities;

4. A clear process for progressing through the program, including frequent reviews by a multidisciplinary team, individual behavior plans, and transparency and tangibility in the review criteria; and

5. Carefully planned transitions to general population.

(Doc. 209-1, pp. 19-20). It also cautions against "loops," where a violation of rules automatically places the prisoner back at the beginning of the process. (*Id.*, p. 21). The second article, "Working to Limit Restrictive Housing: Efforts in Four Jurisdictions to Make Changes" was put forth by the Association of State Correctional Administrators and Liman Center for Public Interest Law. (*Id.*, pp. 29-49). Finally, Plaintiff included a press release from the State of Tennessee, which contains a broad description of their 160-hour Restrictive Housing Step-Down Program. (*Id.*, p. 51).

Plaintiff's specific requests for an injunction appear to have changed over time. In his Motion, Plaintiff requested an Order requiring IDOC to implement a transitional plan in accordance with four requirements:

1. It should be tailored to Plaintiff and his specific psychological profile and needs, and should be monitored and potentially adapted over time.

2. It should involve a gradual introduction to structured activity outside his cell over the course of months, not weeks.

3. Plaintiff should have a counselor that speaks with him in person regularly to cope with the feelings of fear and being overwhelmed that inevitably accompany the transition process.

4. Plaintiff should have a single-occupancy cell during the transition that he can retreat to for alone time.

(Doc. 170). At the hearing, Plaintiff's counsel proposed a somewhat different set of relief. First, he suggested that the Court order the parties to meet and confer within a given time to try and come up with an agreed scheme. (Doc. 207, p. 82). In the alternative or if that failed, Plaintiff proposes that the Court order each side to submit proposed transition plans for the Court's adoption or appoint a special master. (*Id.*, pp. 82-83). In his Post-Hearing Brief (Doc. 209), Plaintiff retreats somewhat to his original position on requested relief. He appears to concede that IDOC's current plans meet Points 1 (an individualized and adaptive plan) and 4 (maintain Plaintiff in a single-occupancy cell during the transition period). (Doc. 209, p. 6). He now asks that the Court order for "an appropriate and gradual 'step down' program" and that a counselor be available on a "regular" basis

instead of the current twice-per-month basis. (*Id.*, pp. 6-7). He goes on to suggest a transfer to the Joliet Treatment Center, or "if Joliet is unsuitable, or if Mr. Wallace is somehow ineligible for such a transfer" require Menard to "construct a program that incorporates the testimony of Dr. Grassian and the experience of states that have reformed their systems." (Doc. 209, pp. 8-9).

## **Legal Standards**

Preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Mandatory preliminary injunctions, like the one requested here are "ordinarily cautiously viewed and sparingly issued." *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

Under Federal Rule of Civil Procedure 65, the party moving for an injunction has the burden of showing that 1. it has some likelihood of succeeding on the merits, 2. that no adequate remedy at law exists, and 3. that it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant establishes these elements, the Court must then balance the potential harm to the movant if the preliminary injunction were wrongfully denied, against the potential harm to the non-movant if the injunction were wrongfully granted. *Cooper v. Salazar*, 196 F.3d 809, 813

(7th Cir. 1999). The Court should also take into consideration the effect that granting or denying the injunction will have on the public. *Girl Scouts*, 549 F.3d at 1086.

The Prison Litigation Reform Act ("PLRA") adds an additional layer of restrictions to injunctive requests by prisoners. 42 U.S.C. § 1997e & 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a)). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted).

Plaintiff's claim relating to his transition to general population is twofold. First, he argues that releasing him into the general population without an adequate plan would be deliberate indifference to Plaintiff's serious medical needs—specifically, his psychological needs. Deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). The deliberate indifference

inquiry has two parts: (1) whether a plaintiff suffered from an objectively serious medical condition and (2) whether the defendants were deliberately indifferent to that condition. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019). Under the Eighth Amendment, a prisoner is not entitled to demand specific care or best care possible, but only to "reasonable measures to meet a substantial risk of serious harm to her." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Second, Plaintiff argues that the transition plan violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 794-794e. The analysis governing the ADA and the RA is the same, "except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons." *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012). ADA and RA claims require that a claimant show (1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability. See 29 U.S.C. § 705(2)(B); *Wis. Cmty. Serv. v. City of Milwaukee*, 465 F.3d 737, 746 (7th Cir. 2006); *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997). Refusing to make reasonable accommodations is tantamount to denying access; although the RA does not expressly require accommodation, "the Supreme Court has located a duty to accommodate in the statute generally." *Wis. Cmty. Serv.*, 465 F.3d at 747; *see also Alexander v. Choate*, 469 U.S. 287, 300-

01 (1985). Defendants concede for purposes of the Motion that Plaintiff is a qualified person with a disability. (Doc. 215, p. 13).

### Discussion

### Likelihood of Success on the Merits

As noted, to obtain a preliminary injunction, Plaintiff must demonstrate a likelihood of success on the merits. A movant's showing of likelihood of success on the merits must be "strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020) (citing *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020)). This "does not mean proof by a preponderance .... [b]ut it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*[2]

In this, Plaintiff has not shown a sufficient likelihood of success to clear this hurdle as to the Transition Plan and related Treatment Plan on either deliberate indifference or ADA/RA grounds.[3]

The plans at issue straddle the line between medical treatment and prison operations. The Transition Plan was formulated by a mixture of prison staff (Major

---

[2] How strong this likelihood must be is the subject of some uncertainty. The holding in *Illinois Republican Party* specifically condemns the previously-applied standard of "better than negligible chance of success" but offers little in the way of guidance other than "less than a preponderance of evidence." Further, the Seventh Circuit has said that the "sliding scale" approach still applies, despite the recalibration of the standard. *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020). The Court assumes that the low end of the sliding scale now starts at "strong" and becomes more demanding from there.

[3] The Court makes no indication regarding Plaintiff's likelihood of success at trial on his deliberate indifference claims regarding past deliberate indifference.

Rowland) and mental health staff (Morris), while the Treatment Plan appears to have been the work primarily of Morris. On a deliberate indifference claim with regard to the medical and mental health aspects, prison officials are generally entitled to rely on the professional judgment of medical staff, unless they have a reason to believe (or actual knowledge) that such staff "are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008). Medical professionals, in turn, may be found to be deliberately indifferent if they make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020).

Here, the evidence is that Rowland relied on his professional judgment in formulating the overall Transition Plan in consultation with Morris, and that Morris in turn relied on her professional judgment in determining that the Transition Plan and Treatment Plan were adequate to address Plaintiff's mental health needs during the transition. At the hearing Plaintiff's counsel voiced his own belief that Morris's efforts were undertaken in good faith. (Doc. 207, pp. 77-78). The standard is not whether a professional's judgment is correct, just that they used their judgment in deciding on the course of action. The evidence adduced shows that professional judgment was utilized,

Plaintiff's line of attack has been that Morris and the other prison officials involved lack the training and expertise to put together an effective plan. In his reply brief, Plaintiff

argues that the "professional judgment" standard (and its inherent deference to that judgment) should not apply to Rowland and Morris. In *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982), the Court articulated the "substantial departure from accepted professional judgment, practice, or standards" in the context of restraint of involuntarily committed individuals. In a footnote, the Court defined a "professional decisionmaker" as a person "competent, whether by education, training or experience, to make the particular decision at issue." *Id.*, n. 30. Plaintiff argues that IDOC cannot establish Morris (and Rowland) is entitled to deference to professional judgment because of their "total unawareness of the harms inflicted by long-term solitary confinement." (Doc. 219, p. 5). Morris is a licensed clinical social worker with both a bachelor's and master's degree in social work. (Doc. 188-1). Rowland has an associate's degree in criminal justice and more than 20 years as a corrections officer at Menard. (Doc. 207, pp. 16, 25). There is nothing in the record that suggests that Morris and Rowland are without the necessary professional qualifications and experience levels to make competent decisions regarding a Plaintiff's transition from segregation to general population.

  Dr. Grassian did illuminate for the Court the unique and difficult challenges faced by a person who has been confined alone for long periods of time. He also provided opinion evidence that the Transition Plan is not adequate. However, Dr. Grassian did not offer his opinion as to the accepted professional judgment, practice, or standards for such step-down programs; he himself stated he does not have the expertise to create such a

plan. (Doc. 207, p. 69). Further, the scholarly articles presented by Plaintiff tend to reinforce the impression that the Transition Plan is at least within the realm of accepted professional judgment, practice, or standards. The Transition Plan appears to largely meet the recommendations of the Vera Institute of Justice paper, which does not address the primary shortcoming alleged by Plaintiff—the ability for Plaintiff to disengage and retreat to his cell when the stress of interaction becomes overwhelming. The ASCA-Liman Center article describes Colorado as giving transitioning prisoners programming "regardless of whether they want it or not." (Doc. 209-1, p. 32). That would appear to be the exact opposite of the ability to disengage and retreat.

Plaintiff has not made a strong showing of likely success on the merits as to the adequacy of his Transition Plan and Treatment Plan. It may be that a group of top penologists and psychological experts could craft a scheme that would give Plaintiff the best or least a better chance of successfully completing the transition to general population than the one IDOC and Menard staff have devised, but that is not the standard. The evidence suggests that although they may not be the best options to ensure an optimal outcome for Plaintiff, these plans do represent "reasonable measures to meet a substantial risk of serious harm" and so pass the bar of constitutional muster.

Similarly, Plaintiff's ADA/RA claim does not show a strong likelihood of success. Plaintiff's argument is that he "is being denied access to a meaningful transition plan, because the plan proposed by the Defendants will exacerbate rather than accommodate

his serious mental illness." (Doc. 171, p. 9). First, there is no evidence that Plaintiff is being denied access to a program that other non-disabled prisoners have—quite the opposite, as Plaintiff's argument is that the transition scheme applied to other prisoners is too one-size-fits-all for him. What Plaintiff is really arguing is that the Transition Plan and Treatment Plan do not constitute a reasonable accommodation for his mental illness within the overall scheme. However, a reasonable accommodation does not require a perfect cure for the problem. *See Stewart v. County of Brown*, 86 F.3d 107, 112 (7th Cir. 1996). In defining a reasonable accommodation in correctional facilities, courts consider the accommodation "in light of the overall institutional requirements," including security and safety concerns and "administrative exigencies." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996). Such a determination is "highly fact-specific" and requires a case-by-case analysis. *Dadian v. Village of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). There is no question that prison staff has made accommodations for Plaintiff's mental condition in the Transition Plan and Treatment Plan; Plaintiff only contests the adequacy of those accommodations. Plaintiff has not presented any evidence regarding the other factors the Court would have to consider in a finding on the merits, including how the requested accommodations would (or wouldn't) affect institutional security or safety concerns. Simply asserting that the present accommodations are not sufficient does not constitute a strong showing of likelihood of success.

**Irreparable Harm and Inadequate Remedy at Law**

The party moving for a preliminary injunction must demonstrate he or she will likely suffer irreparable harm absent the injunctive relief. *Whitaker By Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1044 (7th Cir. 2017). "This requires more than a mere possibility of harm" but "does not, however, require that the harm actually occur before injunctive relief is warranted." *Id.* Also, the moving party must demonstrate there is no adequate remedy at law because "any award would be seriously deficient as compared to the harm suffered." *Id.* at 1046 (internal quotations omitted). Inadequate remedy at law may be established by showing "preventable life-long diminished well-being and life-functioning." *Id.*

Plaintiff identifies two irreparable harms at issue. The first is the inherent harm of a continuing violation of Plaintiff's constitutional rights. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."). As discussed above, however, Plaintiff has not made a clear showing of likelihood of success on his claim of a constitutional violation. He has therefore not shown that the harm from such a violation is likely to occur.

The second identified irreparable harm is the psychological consequences. Here, the sole evidence presented regarding the potential harm was Dr. Grassian's testimony at the hearing:

> Q:   In the absence of that element of a program, that element
>      of a step-down program in a transition program, is it possible

>>that Mr. Wallace's mental condition and physical condition could be substantially harmed?
>
>A.   Certainly his mental condition could be substantially harmed. You put him in a situation which he's overwhelmed, how is he going to manage it? If he can't get away from it, it's very likely he'll get sicker or he won't be able to tolerate it and will act out in some fashion, like becoming self-destructive, becoming irritable, having fights with -- you know, arguments with the corrections officers.

(Doc. 207, p. 67:24-68:9). In describing more generally the effects of placing prisoners leaving solitary confinement into general population without retreat to their cells, Dr. Grassian stated that they "become paranoid. They become fearful. They feel overwhelmed, irritable." (*Id.*, p. 62:21-63:1)

While psychological conditions do not lend themselves to easy or definite predictions of future course, this is too broad a range of *possible* outcomes to support the extraordinary step of a mandatory preliminary injunction. The Court assumes that "sicker" means a significant exacerbation of his existing severe mental health issues, which (along with becoming self-destructive) would qualify as irreparable harm with no adequate remedy at law. Plaintiff becoming irritable and having arguments with corrections officers is not irreparable harm. Without some indication of the likelihood of each of these consequences occurring, the Court cannot justify the imposition of a mandatory injunction.

**PLRA Compliance**

17

Further discussion is appropriate on the requested relief and its compliance with the PLRA. The purpose of a preliminary injunction is to preserve the status quo until the merits of a case can be resolved. *Indiana Civ. Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001). The PLRA's limitation of prospective relief to that which is "narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation" further constrains the relief the Court could afford Plaintiff even if it found he were entitled to a preliminary injunction on this issue. Plaintiff argues that transitioning out of long-term segregation without a plan meeting his criteria he "will endure even greater mental suffering and possibly physical harm" and that the current plan "will cause him irreparable harm should it be allowed to continue in its current form. (Doc. 171, p. 2 and Doc. 209, p. 8). The implication of this argument is that the least intrusive and most narrowly-drawn solution to a potentially harmful transition is to stop the transition, preserve the status quo and keep him in segregation—an outcome that neither the parties nor the Court view as desirable.

Moreover, the caution with which courts approach injunctions involving prison operations—especially mandatory injunctions—reinforces the conclusion that Plaintiff's desired remedy goes too far. It is axiomatic that correctional officials "must have substantial discretion to devise reasonable solutions to the problems they face[,]" especially when they involve matters of safety and security. *Florence v. Bd. of Chosen*

*Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012).  Here, Plaintiff is asking for a program that allows him to move from group settings to his cell as he may deem necessary, which clearly implicates security and staffing matters.  It follows that Plaintiff's transition from long-term segregation to general population necessarily involves matters of safety and security as well as mental health services.

Picking apart the Transition Plan and Treatment Plan element by element and imposing a framework with requirements of this specificity is precisely what the PLRA and precedent cautions against.  While the individual facts of some cases merit that level of intervention, the circumstances here do not suggest it would be warranted even if injunctive relief were appropriate.

## Disposition

For the reasons stated above, Plaintiff's Motion for Preliminary Injunction (Doc. 170) is **DENIED**.

**IT IS SO ORDERED.**

DATED:  February 18, 2021

**DAVID W. DUGAN**
**U.S. District Judge**