## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MAURICE L. WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT JEFFREYS, | ) | |
| DOUG SIMMONS, | ) | |
| ROBERT MUELLER, | ) | |
| JOHN EILERS, | ) | |
| FRANK LAWRENCE, | ) | Case No. 17-cv-576-DWD |
| KIM BUTLER, | ) | |
| JACQUELINE LASHBROOK, | ) | |
| ALEX JONES, | ) | |
| ALYSSA WILLIAMS, | ) | |
| MELVIN HINTON, | ) | |
| JOSHUA SCHOENBECK, | ) | |
| JASON HART, | ) | |
| SANDY WALKER, | ) | |
| STEVE RATHKE, | ) | |
| TIFFANY HILL, | ) | |
| BILL WESTFALL, | ) | |
| LISA GOLDMAN, | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| CHRISTINA FLOREANI. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Maurice Wallace, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Menard Correctional Center ("Menard"), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred in relation to his continuous placement in solitary confinement or restrictive housing from 2006 until recently. Plaintiff alleges that he has been held in solitary

confinement or restrictive housing without adequate mental healthcare, without adequate conditions of confinement, without sufficient reviews of his placement, and in violation of the Americans With Disabilities Act and the Rehabilitation Act.

On June 20, 2022, Defendants Floreani and Wexford moved for summary judgment. (Docs. 168, 169). Plaintiff responded (Doc. 284), and Defendants Floreani and Wexford replied (Doc. 294). Plaintiff moved for a hearing on the motion. (Doc. 304). The matter is now ripe for consideration. The Court also has a pending Motion for Summary Judgment filed by the Illinois Department of Corrections employees involved in this lawsuit (Doc. 280), but that motion will be addressed separately to avoid confusion. Although the Court does not take the allegations lightly, for reasons explained herein, Plaintiff's claims are insufficient to proceed beyond summary judgment against Defendants Floreani or Wexford.

PROCEDURAL HISTORY

Plaintiff initiated this litigation on June 1, 2017, at which time he filed a pro se complaint. The previously assigned judge, Judge David Herndon (ret.), initially designated Plaintiff as someone with 'three strikes' under 28 U.S.C. § 1915(g), but that determination was later overturned by the Seventh Circuit Court of Appeals, and Plaintiff was allowed to proceed. On July 31, 2018, the case was returned from the Court of Appeals, and the Court appointed counsel to assist Plaintiff with this matter. By October of 2018, counsel had appeared on Plaintiff's behalf, and an amended complaint was in the works. After multiple rounds of amendment, the operative complaint—the Fourth

Amended Complaint—was accepted by the Court and service of process issued.  (Doc. 152).

As the operative pleading, the Fourth Amended Complaint sets forth six claims, but only one is relevant to Defendants Floreani and Wexford.  Specifically, Claim 2 alleges deliberate indifference by Wexford and Floreani, for their alleged failures to treat Plaintiff's serious mental health needs.  (Doc. 152 at 35-36).  Plaintiff alleges that the defendants were aware of his serious needs or strongly suspected them, and yet they failed to take measures to provide adequate medical and mental health care.  Specifically, he alleges that defendants' "policies, customs, practices, procedures, and acts or omissions failed to provide adequate medical and mental health care for Plaintiff's serious medical and mental healthcare needs."  (Doc. 152 at ¶ 228).

Defendants Floreani and Wexford filed a timely Motion for Summary Judgment and supporting Memorandum.  (Docs. 168, 169).  The motion is supported by a Statement of Material Facts (SUMF) (Doc. 269-1), Floreani's affidavit (Doc. 269-2), Floreani's psychiatric treatment notes (Doc. 269-3), Floreani's deposition (Doc. 269-4), Plaintiff's deposition (Doc. 269-8), Plaintiff's responses to interrogatories (Doc. 269-5), depositions of other individuals (Docs. 269-6, 269-7, 269-9, 269-10, 269-11, 269-14, 269-17), reports from the seriously mentally ill (SMI) segregation review committee (Doc. 269-12), Plaintiff's expert's report (Doc. 269-13), administrative directives (Doc. 269-15), and adjustment committee reports and disciplinary reports (Doc. 269-16, 269-18).

Plaintiff filed a response to summary judgment (Doc. 284).  However, Plaintiff did not explicitly respond to the Defendant's SUMF, nor did he provide his own set of

Additional Undisputed Facts in support of his response to summary judgment.  Instead, Plaintiff filed a freestanding Notice (Doc. 293) with a short factual narrative, a Statement of Material Facts that Preclude Summary Judgment for all Defendants.  (Doc. 286), and an index of exhibits with reports and reviews, emails, deposition excerpts, limited psychiatric records, and an expert report (Docs. 287, 300).

Defendants filed a response to Plaintiff's freestanding statement of facts (Doc. 296), a reply (Doc. 294), and one additional exhibit (Doc. 299).

### FINDINGS OF FACT

In the factual allegations of the Fourth Amended Complaint, Plaintiff alleged that Floreani knew or seriously suspected that he had a serious medical need, but she consciously failed to take reasonable measures to provide adequate treatment.  (Doc. 152 at ¶¶216-17).  At his deposition, Plaintiff stated that Floreani "failed or refused to make certain recommendations with respect to his long-term segregation, amongst other things."  (Pltf. Dep., 269-8 at 23:13-16).

Per Defendant Floreani's SUMF, Plaintiff first saw Floreani on May 2, 2018, and he last saw Floreani on June 11, 2019.  (Floreani SUMF, Doc. 269-1 at ¶¶ 4, 42).  During this time, Floreani saw Plaintiff on June 5, 2018, August 1, 2018, October 31, 2018, November 13, 2018, November 26, 2018, December 19, 2018, February 20, 2019, April 9, 2019, May 31, 2019, and June 11, 2019.  At each meeting, Floreani assessed Plaintiff's needs, and she adjusted his medications in accord with his symptoms and his expressed desires.  During the same timeframe, Plaintiff refused to attend appointments with Floreani on July 11, 2018, August 30, 2018, October 3, 2018, and January 24, 2019.  During treatment, in

January of 2019, Floreani learned from the medication administration records that Plaintiff was largely refusing his medication, and she learned directly from Plaintiff on February 20, 2019, that he decided to stop his medications and opted instead to use 'holistic measures' to address his symptoms.  (Doc. 269-1 at ¶¶ 29-30).  After this decision, Plaintiff complained of hallucinations and flashbacks in April of 2019, and he was given new medications to target those symptoms.  (Doc. 269-1 at ¶¶ 33-35).

Floreani's declaration largely mirrors the SUMF.  (Doc. 269-2).  Floreani attested that she did not have control over Plaintiff's placement, in segregation, or in any other housing situation.  (Doc. 269-2 at ¶ 48).  Floreani was never asked to give an opinion about the appropriateness of Plaintiff's placement in segregation, nor was she invited to participate in Adjustment Committee reviews, or Seriously Mentally Ill (SMI)[1] Segregation Reviews.  (Doc. 269-2 at ¶¶ 49-50).

Floreani's deposition testimony is consistent with the SUMF and her declaration. Floreani provided psychiatry services at Menard exclusively by video or teleconference. (Floreani's Dep., Doc. 269-4 at 18:2-6).  Floreani met with mental health professionals

---

[1] The SMI designation was created by IDOC some time in 2016.  (Hinton Dep., Doc. 269-6 at 40-41).  The medical providers all testified that the designation is not a clinical diagnosis, it is a classification by the IDOC, that *can* in some instances be correlated to a diagnosis.  Dr. Poteat explained that it "certain things are automatically designated as being SMI," and individual can also receive the SMI label if their "Modified Global Assessment Functioning" (MGAF) score is less than 50, or if they are on crisis watch.  (Poteat Dep., Doc. 269-7 at 44:7-24).  Melissa Pappas testified that some of the diagnoses that qualified for an automatic SMI label were psychotic disorder, bipolar disorder, major depressive disorder.  (Pappas Dep., Doc. 269-17 at 32:6-23).  She testified that a PTSD diagnosis would not automatically invoke an SMI designation.  (*Id.* at 32:7-9).  Dr. Hinton clarified that "It's based on a very specific definition and a level of functioning determination.  That is not a mental illness or a diagnosis. … Mental illness is— or a diagnosis is defined by the DSM, Diagnostic Statistical Manual of Mental Illness disorders, is the kind of official term when you talk about diagnosis that any psychologist, psychiatrist, physician would utilize in actually diagnosing an individual. The level of care that you referenced earlier about the intensity of treatment that an individual receives. Again, that is different from a designation of SMI. So before there was the use of the designation of seriously mentally ill, there was always treatment for every individual in the IDOC[.]"  (Hinton Dep., Doc. 269-6 at 43:7-23).

(MHPs) at Menard, but she did not have direct oversight of treatment decisions by anyone at Menard or Wexford. (*Id.* at 19:22-20:19; 21:3-9). Her treatment notes and decisions were sent to administrative staff at Menard and could have been viewed by the MHPs or treatment team, but they were not reviewed by Wexford. (*Id.* at 35: 17-36:21). Floreani was aware that inmates met with MHPs often, and she would get reports from the MHPs on inmates' day-to-day functioning between appointments with her. (*Id.* at 85:16-86:7). Floreani testified that she and MHPs at Menard worked together as a team and tried to have similar and aligned goals. (*Id.* at 125:18-126:7). Floreani did not recall specifically recommending Plaintiff for a residential treatment unit (RTU), nor was she sure if she had input in that process, but she opined that Plaintiff would not have benefitted from that setting at the time she treated him because he was not engaging in the sort of mental health services he was offered that would also be offered at an RTU. (*Id.* at 119:9-120:24). Floreani testified that she was never asked to provide an opinion about the appropriateness of segregation for Plaintiff. (*Id.* at 105:15-106:23; 123:5-9).

In addition to evidence specific to Floreani, the Defendants offered deposition testimony from non-party Dr. Thena Poteat, a psychiatrist that began treating Plaintiff in 2019, and continued to treat him at the time of her deposition in 2021. (Poteat Dep., Doc. 269-7). They also included deposition testimony from Melissa Pappas (a licensed clinical professional counselor and non-party to this case), Tiffany Hill (an IDOC employee with a master's in social work), and Dr. Melvin Hinton (an IDOC employee and the head of mental health for IDOC). The mental health professionals gave context for the treatment environment at Menard. The Defendants also provided deposition testimony from

Jacqueline Lashbrook (a former warden and IDOC employee), Kent Brookman (a non-party and IDOC employee), and Joshua Schoenbeck (a member of the Adjustment Committee and an IDOC employee) to give context for the overall operations at Menard.

In Plaintiff's SUMF, he asserted that "the record contains *no* evidence suggesting that Drs. Poteat and Floreani exercised medical judgment when they declined to make any recommendation about Mr. Wallace's solitary confinement."[2]  (Plaintiff's SUMF, Doc. 286 at ¶ 38).  As to Wexford, Plaintiff stated, "Wexford maintained a policy of inaction whereby it barred its doctors from advising IDOC personnel on the need to remove inmates from solitary confinement when it contributed to mental decompensation."[3]  (Plaintiff's SUMF, Doc. 286 at 3 ¶ 10).  Plaintiff's exhibits in opposition to summary judgment include deposition excerpts from many of the depositions provided in full-length by the Defendants, as well as deposition excerpts from Dr. Sylvia Lane Butler (an IDOC psychologist), and Dr. Reister (an IDOC medical administrator), expert reports from Dr. Grassian, letter and email correspondence about Plaintiff's continued segregation (with IDOC officials), and two psychiatric progress notes from Dr. Poteat in 2019 (July and September of 2019).

In reply, the Defendants submitted a residential treatment unit (RTU) referral form completed by Dr. Poteat in November of 2019.  (Doc. 299).  In the RTU form, Dr. Poteat stated that RTU placement may be beneficial for "diagnostic clarification," and she discussed the difficulties of treating Plaintiff.  (Doc. 299 at 1).  Specifically, she noted

---

[2] This factual assertion is not supported by specific citations to the record.  In response to Plaintiff's SUMF, the Defendants argue that this factual assertion should be stricken pursuant to Fed. R. Civ. P. 56(c).  (Doc. 296 at 13).
[3] This factual assertion is not supported by specific citations to the record.

concerns that Plaintiff would not participate in programming at an RTU, and that he could pose a threat to others with his history of violence.  She noted "[a]fter reviewing his 6 volumes of medical charts, there seems to be a pattern where Mr. Wallace has used symptoms of mental illness for secondary gains only to have the symptoms remit when no longer needed."  (Doc. 299 at 3).  She additionally noted his intermittent compliance with medications, his refusal to take medications that would typically be used to treat the mental illness of psychosis for sustained periods of time, and his occasional refusal of his low dose of Abilify.[4]  She noted, when he refuses Abilify, his behavior does not seem to change.  (Doc. 299 at 3, 5).

CONCLUSIONS OF LAW

### A.  Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).  Courts generally cannot resolve factual disputes on a motion for summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted).

---

[4] Dr. Grassian characterized the dosage of Abilify as "high."  (Doc. 300 at 115).  Plaintiff apparently reported in interview to Dr. Grassian that his dose was 30mg per day (Doc. 300 at 115), but Dr. Poteat's records reflect just 5mg (Doc. 300 at 182), as do Dr. Floreani's (Doc. 269-3 at 95).

### B. Analysis

This case is made complex by the sheer volume of material submitted, by the duration of time involved, by the intertwined nature of the issues presented, and by the subject matter of the allegations presented.  Mr. Wallace spent upwards of 5,000 days—or 14 years—in some form of segregation or isolated housing.  Anyone reviewing the case is likely to pause at these numbers and to think that 14 years was too many years to be in segregated housing, but the claims against Defendants Floreani and Wexford are premised on Section 1983, and the standards for such claims are high.  A Plaintiff cannot state a recoverable claim by simply identifying shocking facts, he must also identify knowing actions by the defendants that led to a concrete harm.

It is difficult to assess the material facts at issue in this case because counsel for both sides skirted the Federal Rules for Civil Procedure and the Local Rules.  Specifically, Local Rule 7.1 requires a motion for summary judgment to include a brief, and Rule 7.1(d) provides that briefs may not exceed 20 pages.  Defense counsel submitted a brief that was 20 pages, but the SUMF was attached as a 13-page exhibit.  Counsel did not seek leave of Court for an over-length brief.

Similarly, Plaintiff's counsel did not file a traditional responsive pleading to the Defendants' Motion for Summary Judgment.  Notably, Plaintiff's response did not include a section that addressed Defendants' SUMF, and it did not include Plaintiff's own statement of undisputed fact.  Instead, Plaintiff's counsel filed a separate SUMF (Doc. 286) that is apparently meant to cross-apply to Defendants' present motion, and to the

IDOC Defendants' motion.  Plaintiff's SUMF does not comply with Federal Rule of Civil Procedure 56(c)(1), which requires that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record."  In response to Plaintiff's SUMF, Defendants argue that any of the material factual assertions that are unsupported by citations to the record should be stricken.  In addition to Plaintiff's SUMF, Plaintiff also filed a separate "Notice" that is apparently responsive in an abstract sense to Defendants' SUMF.  (Doc. 293).  The Defendants argue that because this "Notice" is not an appropriate response to their SUMF, under Federal Rule of Civil Procedure 56(e), the Court should consider their SUMF undisputed.

These pleading oddities make it difficult for the Court to determine the operative facts.  The Court was required to scrutinize nearly 1000-pages of briefs and exhibits to discern relevant facts, and to clearly identify disputes.  Although the Court could have directed the parties to re-brief the issues or to repair the record, significant time has already been invested in this case by all parties, and the case has been pending for many years.  Under Federal Rule of Civil Procedure 56(e)(2) and (3), the Court considered facts as undisputed where appropriate, and it considered the appropriateness of summary judgment for the movants on the motion and all supporting materials.

Technicalities aside, the Court also notes that it is difficult to determine the exact scope of the claims presented in this litigation.  Plaintiff's Fourth Amended Complaint opens with the assertion that he has been in solitary confinement for nearly 13 years, and allegations within the pleading speak in broad terms about how the Defendants should

have done more to prevent Plaintiff's continued solitary confinement.  Despite these broad assertions, Defendant Floreani only treated Plaintiff from May 2, 2018-June 11, 2019 so any claim involving Floreani is necessarily limited.  As to Wexford, it appears that there is only evidence concerning the most recent Wexford employees who have interacted with Plaintiff.

### i. Dr. Floreani

In the Fourth Amended Complaint, Plaintiff alleged that Floreani exhibited deliberate indifference to his serious mental health needs by failing to provide adequate treatment.  At his deposition, and in response to summary judgment, Plaintiff's argument is somewhat different.   He instead contends that Floreani exhibited deliberate indifference because she failed to address his complaints about his continued confinement in segregated housing.

Section 1983 provides a private right of action against persons acting under color of state law who violate constitutional rights.  42 U.S.C. § 1983.  Prison officials and medical staff violate the Eighth Amendment's prohibition on cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs.  *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017).  To prevail on an Eighth Amendment claim of constitutionally-deficient medical care, a prisoner must satisfy a two-part test.  *Id.*  He must establish that he had an objectively serious medical need.  *Id.* The second, subjective prong requires a prisoner to show that the defendant had knowledge of facts from which he or she could infer that a substantial risk of serious harm exists and then disregards that risk.  *Id.* at 476.  The burden is on the prisoner to

demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one. *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014).

The operative question is whether there is evidence in the record from which a rational jury could find that Defendants were deliberately indifferent to Plaintiff's medical needs. An inmate is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). If a risk from a course of medical treatment, or lack thereof, is obvious, a factfinder can infer that a defendant knew about it and disregarded it. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). The Seventh Circuit has "identified several circumstances that can be enough to show deliberate indifference" including that the defendant ignored a request for treatment, substantially departed from accepted professional standards, persisted in an ineffective course of treatment, or inexplicably delayed treatment. *Id.* at 729. Evidence that an inmate and doctor disagree about the proper course of treatment, or even that two doctors disagree about the appropriate course of treatment is not enough to establish deliberate indifference. *See e.g. Pyles*, 771 F.3d at 411. A patient is not entitled to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Expert testimony that a reasonable course of care would include a particular treatment, *Duckworth v. Ahmad,* 532 F.3d 675, 681 (7th Cir. 2008), or that a treatment decision was unreasonable, *Zaya v. Sood,* 836 F.3d 800, 807 (7th Cir. 2016), are not standalone evidence of deliberate indifference.

As to the traditional deliberate indifference claim against Floreani—the record evidence supports granting summary judgment in favor of Floreani. The mental health records submitted, Floreani's declaration, and Floreani's deposition testimony all demonstrate that she provided a constant course of care for Plaintiff that was responsive to his stated needs. Each time that Plaintiff attended an appointment, Floreani adjusted

his medications based on his reported symptoms and requests.  Floreani actively controlled medication changes such that a change or taper of one medication would not interfere with the assessment of another medication's efficacy.  Plaintiff does not dispute that Floreani's care was sufficient in this respect.[5]

Instead, Plaintiff now contends that Defendant Floreani was deliberately indifferent to his mental health needs because she did not do anything to change his housing location from segregation, to something with more liberties.  This theory fails for two reasons.  First, it is not clear that this theory of deliberate indifference aligns with what was presented earlier in the case.  "When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories the plaintiff has pursued so far.  *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017).  Factual allegations must be pleaded in a complaint and must remain consistent throughout litigation, whereas legal theories can be altered.  *See id.* at 859-60; *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020). "An attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint," and "the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims."  *Chessie*, 867 F.3d at 859-60.

---

[5] Plaintiff's expert, Dr. Stuart Grassian, opined that Plaintiff's treatment by medication was "almost cynical" because it treated symptoms without addressing the root cause of the problem, but to the extent that this opinion is a contrast to Floreani's course of treatment it is not enough to establish deliberate indifference.  (Grassian's Report, Doc. 300-1 at 27-28).  Differing expert opinions standing alone, are not enough to create a genuine dispute of fact about the reasonableness of a course of care.  *See e.g., Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016) (differing opinions by experts or medical professionals are not enough to establish deliberate indifference).

In the Fourth Amended Complaint, Plaintiff's factual allegations against Floreani were limited to an assertion that "Floreani has consciously failed to take reasonable measures to provide adequate treatment for [Plaintiff's] serious medical need." (Doc. 152 at ¶¶ 216-18).   These factual allegations correlate with Claim 2, a count for Eighth Amendment deliberate indifference.   The legal theory in the Fourth Amended Complaint and in response to summary judgment is similar, but the factual underpinnings are arguably different.   The Complaint relied on a bare assertion that Floreani did not provide adequate treatment as a mental healthcare professional, whereas the response to summary judgment hinges on the factual assertion that Floreani's medication management was fine, but she failed because she did not recommend an alternate housing placement to segregation.   To the extent that Plaintiff presents an entirely new factual theory on summary judgment, this change is not permissible so late in the litigation.

Second, even if Plaintiff's arguments in response to summary judgment do not rely on new and distinct facts, Plaintiff's theory for relief against Floreani still fails.   The deposition testimony of multiple Wexford providers tends to show that although mental health staff were not closely involved in segregation housing determinations, there were some limited opportunities for input.  Dr. Thena Poteat (an individual who held the same role as Floreani) testified that,

[T]he psychiatrists are really focused in on medication management.  There are other individuals on the team, the MHPs and the BHTs[6] that are responsible for pretty much everything else except medications.

So the—the role of the psychiatrist is—is really limited in terms of—of an effort to try to—try to focus in on—on those issues that no one else on the team is in a position to – to take care of.  So they—they intentionally kind of take a lot off my plate in terms of I am not involved in things related to discipline and housing and—and all the other things that are relevant to someone's mental health situation, but those things, to the extent that mental health is involved in them at all, I'm not the person on the mental health team at all that is – that is in those meetings where things like tickets and discipline are discussed.  I'm not directly involved in those things.  If – if someone brings those issues to my attention, I either, during one of our meetings or sometimes individually, will try to talk with their assigned MHP and – and let them know, you know this is an issue going on.  But I – I make an effort to explain to my patients, you know, this isn't something—I'm the person—that's—that's not part of it.

And it's a divided—a divided treatment model.  And so, not unlike when I was in private practice, sometimes I would have patients referred to me by a psychologist or a social worker in the community who was the patient's therapist, but the patient saw me for medication management.

So—so there was a division of responsibilities in that case, and that occurs sometimes in the community, and that's the kind of model that Wexford uses for treating individuals in custody.

(Poteat Dep. 269-7 at 28:3-29:16).  The mental health team members at Menard provide care together.  Individuals who see a psychiatrist, also generally are assigned to a specific MHP, and they will see a BHT on a rotating basis.  (Poteat Dep. ,269-7 at 30:12-19).  Additionally, IDOC social workers also attend meetings and communicate with the mental health team.  (Poteat Dep. 269-7 at 23:22-24:4; 24:21-25:2).

---

[6] A BHT is a behavioral health technician, who are generally bachelor's degree level mental health team members, and a MHP is a mental health professional, who is usually a master's level mental health team member.  (Poteat Dep., 269-7 at 26:10-16).

Although less detailed, Floreani's own deposition testimony described collaboration with the MHPs about the care provided to inmates, and their status. She stated, "every day I met with the MHPs. So they would tell me how the inmates were doing that I was going to be meeting with that day, or that were scheduled with me that day." (Floreani Dep., 269-4 at 85:24-86:4). She further testified, "[W]e had a treatment plan that we worked on together as a team and had similar goals, which we made sure, you know, we were—our goals were aligned for the treatment of any given individual." (Floreani Dep., 269-4 at 126:3-7). Floreani believed that her progress notes may have been used as input for formulating the treatment plan. (*Id*., 269-4 at 125:24-25). Nevertheless, she was never asked to opine on the appropriateness of segregated or solitary housing for Plaintiff (Floreani Dep., 269-4 at 123:5-9), and she does not believe she made a recommendation for him to be moved to a residential treatment unit (RTU). Floreani opined that Plaintiff would not have benefited from placement in an RTU because he was not engaging in services such as therapy, groups, and frequent medication compliance. (*Id*. 269-5 at 120: 10-24).

Although Floreani did not directly participate in discussions about segregation placement, she worked on a collaborative mental health treatment team with other mental health providers who participated in segregation and disciplinary reviews. Context matters. During the short timeframe that Floreani treated Plaintiff, he had been designated as SMI, and his segregation status was being reviewed both by the long-term/indeterminate segregation review committee, and by a separate SMI segregation review committee, that included a mental health representative. When he received

disciplinary infractions, mental health also provided input to the disciplinary proceedings about appropriate discipline, and the Adjustment Committee heeded that advice.  Both Melissa Pappas, a mental health professional for Wexford, and Tiffany Hill a social worker for the IDOC testified that mental health participated in reviewing disciplinary issues for segregated inmates.  (Pappas Dep., 269-17 at 36:2-28; Hill Dep., 269-14 at 71:6-20).  Floreani was not deliberately indifferent for providing medication management while other mental health professionals participated in other aspects of care and gave input about discipline and housing.

Additionally, as Floreani and others testified, placement in segregation was a security decision, and was not directly within the control of mental health staff.  A Court in New York confronted with an Eighth Amendment conditions of confinement claim against mental health providers concluded that regardless of whether healthcare providers might have had some ethical obligation to notify the prison of mental harm suffered by an inmate based on his placement in segregation, there was no legal authority to support a claim against the providers for failing to lobby the prison on the inmate's behalf.  *H'Shaka v. O'Gorman*, 444 F.Supp.3d 355, 382 (N.D. N.Y. 2020).  Although the *H'Shaka* Court considered the actions of the medical providers in the context of a conditions of confinement claim about long-term segregation, this Court finds that the same rationale is applicable here.  Even if Floreani knew that Plaintiff was suffering harm from long-term segregation, and she had some ethical obligation as a medical professional to avoid harm, this knowledge and obligation do not translate to a legally deficient medical care because Floreani ultimately had no control over Plaintiff's housing

situation.  Floreani's role was medication management.  She provided continuous and responsive care for Plaintiff in this respect and Plaintiff points to no contrary evidence. Accordingly, the Court finds it appropriate to grant summary judgment in Floreani's favor under either of Plaintiff's theories of deliberate indifference.

### ii. Wexford

As to Wexford, Plaintiff alleged in his Fourth Amended Complaint that Wexford had customs or practices of: failing to adequately staff trained and competent physicians and failing to adequately supervise the provision of care; failing to follow adequate mental health procedures and to meaningfully participate in the disciplinary review process; downplaying the destructive impact of solitary confinement on inmate mental health; downplaying the seriousness of the mental illness of inmates in solitary confinement; and understaffing IDOC prisons with mental health professionals.  In response to these allegations, Wexford argues that it cannot be held liable via vicarious liability, and it cannot be held liable absent a finding that one of its employees was deliberately indifferent to Plaintiff's needs.  (Doc. 269 at 14-15).  Defendants additionally provided individual refutations to each of the practice or customs that Plaintiff identified in the Fourth Amended Complaint.  (Doc. 269 at 15-20).  Defendants also add that not all mental healthcare workers at Menard are Wexford employees, and not all mental health professionals who met with Plaintiff during the relevant time period were Wexford employees.  The Court will address each argument in turn.

First, as to the contention that Wexford cannot be held vicariously liable for the actions of an employee, this legal premise is correct, but Plaintiff does not appear to rely

on vicarious liability. He does not argue that Wexford should be liable because one employee acted in a particular fashion, or because a group of Wexford employees acted in some fashion. Instead, his arguments are focused more on the way that Wexford structured the provision of mental health care, and how the structure impacted his situation.

The vicarious liability argument aligns closely with Wexford's argument that it cannot be held liable absent a finding of liability against one of its employees. Theories of this nature were considered by the Seventh Circuit in *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010). In *Thomas*, the estate of a deceased inmate claimed that jail personnel were deliberately indifferent to his serious medical condition of pneumococcal meningitis which led to his death, and the County was liable under *Monell* for maintaining customs or practices that contributed to the lack of care and to the inmate's death. At trial, a jury acquitted individual jail employees, but if found the County liable for widespread customs or practices. The County argued that it should not have been found liable once its employees were acquitted, and the evidence did not support a finding against it. The County relied on the same precedent (*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)) that Wexford cites in this case for the proposition that a municipality cannot be found liable if an officer is not liable on the underlying substantive claim.

In *Thomas*, the Seventh Circuit held that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas*, 604 F.3d at 305 (emphasis in original). The *Thomas* Court found that it

would not be inconsistent to find that individual jail employees were not liable for a lack of medical care, while also finding that the county was responsible for overall breakdowns in the provision of medical care. *Id.* The scenario in *Thomas* is on all fours with Plaintiff's case. Although Dr. Floreani may not be liable for her very limited role in providing care for Plaintiff during one year of his 15 or so years in segregation, Wexford could be held liable for its role in the overall provision of mental health services during the longer period of 15 years. A finding that Dr. Floreani is not personally liable, would not be inconsistent with a finding that Wexford maintained a custom or practice that caused harm. Accordingly, the question is, has Plaintiff tendered sufficient evidence to establish a genuine dispute of fact about Wexford's alleged customs or policies? The Court considered each of Plaintiff's five identified practices or customs.

Plaintiff presented two overlapping theories about staffing—he argued that Wexford has a custom or practice of failing to adequately staff trained and competent physicians and to supervise the provision of care, and he argued that Wexford had a custom or practice of understaffing IDOC prisons with mental health professionals. He supported these contentions in his Fourth Amended Complaint by citations to expert reports in other litigation. (Doc. 152 ¶¶205-206). Specifically, he argued that a team of experts found in one class-action case that Wexford failed to hire properly credentialed physicians, and another expert concluded in other class-action litigation that the number of psychiatric contacts at Menard was particularly poor, and that treatment decisions were sometimes unsupported. Whatever merit these theories or contentions may have,

Plaintiff never tied these theories to his personal experience, and he all but abandoned these theories of a harmful custom or practice at summary judgment.

On summary judgment, Wexford argued that Plaintiff has entirely failed to tie allegations about staffing to his personal situation, thus any such claim must fail. Wexford specifically argued that, with reference to Dr. Floreani, it was obvious from her medical records that Plaintiff received frequent and responsive care from Dr. Floreani. After thoroughly reviewing the record evidence submitted by both parties, the Court finds that there is not sufficient evidence to show that Plaintiff was personally harmed by a lack of mental health staff, or that he was personally harmed by Wexford's employment of subpar mental health staff. The only Wexford employee's care that was directly called into question was Dr. Floreani's care, and the records suggest she provided comprehensive care. Deposition testimony of other Wexford employees such as Dr. Poteat, and Melissa Pappas (an MHP), also suggest that Plaintiff did not have a lack of access to care based on staffing problems. Both Drs. Poteat and Floreani described regular meetings with the mental health team, that included Wexford and IDOC employees. They never suggested that the team was understaffed, or unable to meet with the patients as often as needed. Accordingly, Plaintiff has not established that Wexford had a custom or practice of understaffing or hiring subpar staff that personally impacted him.

In two similarly related custom or practice paragraphs, Plaintiff alleged that Wexford had a custom or practice of downplaying the destructive impact of solitary confinement on the mental health of inmates, and Wexford had a custom or practice of

downplaying the seriousness of the mental illness of inmates in solitary confinement. (Doc. 152 at ¶¶ 210-11).  Wexford argues that there is simply no evidence in the record to support these theories.  Unlike the understaffing theories that at least had support in the Fourth Amended Complaint, the theories that Wexford downplayed the seriousness of solitary confinement or mental health implications, were not explicitly supported in the complaint.  It is also not entirely clear that Plaintiff responded to this issue on summary judgment, so these theories may have been abandoned.  Construing the record broadly in favor of Plaintiff, the non-movant, the Court considered if there was sufficient evidence to create a genuine dispute of material fact about Wexford's downplaying of solitary confinement or its implications.

At best, Plaintiff may hope to cite to deposition testimony from various Wexford employees for the proposition that not every mental health professional was aware of the broad repercussions of solitary confinement, or not every Wexford employee embraced these harms when choosing a course of treatment.  Or Plaintiff could point to expert Dr. Stuart Grassian's reports and papers about the impacts of solitary confinement.  Even if it could be found from this evidence that Wexford somehow had a custom or practice of downplaying mental health problems, Plaintiff has not established a causal link between any such practice and his continued placement in solitary or segregated confinement.  As the *Thomas* court noted, "in applying different theories of liability recognized under *Monell*, we have always required plaintiffs to show that their injuries were caused by the policies or practices complained of." *Thomas*, 604 F.3d at 306, *citing Klebanowski v. Sheahan,* 540 F.3d 633, 637 (7th Cir. 2008).  It is not clear from deposition excerpts or from Dr.

Grassian's reports how any custom or practice of downplaying mental health issues by Wexford actually caused Plaintiff's continued confinement in segregation. Because it appears that Plaintiff abandoned this theory, and it is not clear from the record evidence that there are sufficient allegations of causation, the Court finds that Defendants' Motion for Summary Judgment on this sub-theory of liability by Wexford should be granted.

This leaves Plaintiff's allegation that Wexford has a custom and practice of failing to follow adequate mental health procedures and meaningfully participate in the disciplinary review process, which caused continued solitary confinement and further physical and psychological harm on him. (Doc. 152 at ¶209). Defendants argue that there is no evidence in support of this theory, and they provided specific refutations as well. (Doc. 269 at 16-19). First, Defendants argue that an IDOC Administrative Directive controls Wexford's input in the disciplinary review process, so it is not entirely up to Wexford to guide these outcomes. Second, Defendants argue that to the extent Plaintiff identified any occasions where Wexford failed to provide adequate input, he has not tendered sufficient evidence to show a widespread recurrence of this custom or practice sufficient to establish Wexford's liability.

In response to summary judgment, it appears that Plaintiff slightly reframed the alleged custom or practice claim. Instead of reiterating that Wexford failed to follow adequate mental health procedures or that it failed to participate in the disciplinary process, Plaintiff argued that "Wexford maintained a custom or policy by which its treating physicians consciously disregarded the known and obvious risk that continued isolation posed to [Plaintiff's] mental health." (Doc. 284 at 8). He specifically alleges that

"Wexford deliberately and intentionally barred its doctors, the most knowledgeable and well-informed prison personnel when it came to inmates' mental health, from doing anything to recommend or advise that IDOC security staff reduce or remove inmates from solitary confinement[.]"[7]  (Doc. 284 at 8).  He added that Wexford instead assigned less knowledgeable mental health staff to fill out paperwork related to discipline and segregation.  He argues that this system created a disconnect between the known dangers of solitary confinement, and the mental health of inmates in solitary.  He also argued that the Wexford policy for treatment was widespread based on Dr. Poteat's testimony that it was Wexford's "model" for treating incarcerated individuals.  (Doc. 284 at 10).

As to the existence of a known risk, he argues that Wexford providers knew of the risks of solitary confinement, but even if they did not know of the risks, there is sufficient evidence from others to establish at least a genuine dispute about whether the dangers of solitary were so obvious as to be widely known.  Instead of engaging with the known risks, he further argues that Wexford had a policy of doing nothing, and his mental health suffered greatly as a result.  (Doc. 284 at 15-16).

The Defendants provided a copy of the Administrative Directive, which states that as of May 1, 2017, "the Department shall recognize the potential for mental health conditions to impact behavior, and, as such, shall ensure the involvement of a mental health professional during the processes of hearings and administration of discipline for offenders designated as seriously mentally ill to prevent further deterioration."  IDOC

---

[7] This exact assertion was also set forth as a "fact" in Plaintiff's SUMF, but it was not supported by citation to the record, so the Court did not treat it as an undisputed fact.  (Doc. 286 at ¶ 10); Fed. R. Civ. P. 56.

Admin. Directive 05.12.103,  I. B.  (Doc. 269-15 at 1-5).  The Directive contemplates that many different mental health professionals can be involved including psychiatrists, psychologists, licensed clinical social workers, or individuals with a masters degree in social work.  (*Id.* at 2).  Additionally, the Directive provides that if "clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the offender's mental health, the information should be reviewed by the facility mental health authority," and recommendations for a reduction of segregation may be discussed with the CAO and the Deputy Director.  The Directive defines the "mental health authority" as the facility's psychology administrator, or someone designated by the Warden to serve in their absence.

Although a full copy is not included, another Administrative Directive was issued on November 1, 2020, concerning the use of restrictive housing.  Plaintiff's expert, Stephen Sinclair, discussed the parameters of this Directive (05.15.100), which include requirements that mental health professionals make rounds every seven days in restrictive housing, and that if possible, SMI inmates should be diverted from restrictive housing.  (Sinclair Report, Doc. 300 at 131-132).

Both Administrative Directives support Defendants argument that although their input at times may have been welcome concerning segregation, they were not the final decisionmakers about segregation, and they could only make recommendations to the Adjustment Committee, the CAO (Warden), or the Deputy Director.  The existence of the Directives themselves do not create a genuine dispute about Wexford's potential *Monell* liability, but the Directives also do not foreclose a finding of potential liability.

The heart of Plaintiff's argument is that Wexford had some kind of freestanding duty as the mental healthcare provider to alert IDOC that the use of prolonged segregation caused severe damage to the mental health of segregated individuals. He contends they either violated the duty by having an explicit policy that excluded psychiatrists from the conversations about segregation, or that they had a custom or practice of failing to provide crucial input about segregation.

Reading the record broadly in Plaintiff's favor, he identified the deposition testimony of Dr. Poteat wherein she explained that Wexford had a policy of limiting her role to medication management, and that it was the policy they applied to all inmates. Assuming arguendo that this is the official policy, the Court must also consider if the policy violates the Eighth Amendment, and if it caused Plaintiff discrete harm.

A policy of delegation itself does not violate the constitution. Delegation is common both in the medical field (by the use of specialist such as a cardiologist), and in the realm of corrections (a guard versus a prison nurse, etc.). If an identified policy is not unconstitutional on the face, then an inmate may attempt to demonstrate unconstitutionality by arguing that in effect the policy violates the constitution. "Where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). Evidence of a prior pattern of violations is important to establishing a policy claim, but in very rare circumstances, the Seventh Circuit has acknowledged that "the risk of

unconstitutional consequences from a municipal policy 'could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Id.* at 236.

The parties do not engage in such a detailed analysis. Plaintiff does not offer evidence about other inmates in segregation at Menard, nor does he offer evidence from other specific inmates in IDOC. At most, he has referenced findings about the available medical and mental health care in IDOC facilities generated in other litigation. (Fourth Amended Complaint, Doc. 152 at ¶¶ 205-06) (citing the *Lippert* litigation about medical care and the *Rasho* litigation about mental health care). Plaintiff's situation is similar to the policy claim considered in *Dean*, where the inmate's primary evidence of a policy or practice was the expert reports from the *Lippert* litigation (class action litigation about medical care in IDOC). The *Dean* Court concluded that the reports, which likely were inadmissible, were not sufficient to establish notice to Wexford of a violative policy, and that plaintiff lacked additional necessary evidence to support his claim. The *Dean* Court also went on to find that the plaintiff failed to establish causation because he did not show that the policy itself---as opposed to the administration of the policy by select employees—caused him harm.

Plaintiff fails in both respects identified in *Dean*. He has not mounted enough evidence to create a genuine dispute of fact about the constitutionality of the policy, nor has he shown sufficient causation. As to the policy, Plaintiff's only concrete evidence is testimony from Drs. Poteat and Floreani that they were not involved in housing decisions and that they left this to other members of the mental health team at Wexford's direction.

He does not have any evidence to show that this impacted other inmates.  Plaintiff would likely argue that the potential harms of ongoing solitary confinement were so obvious that Wexford should have known that their policy would cause harms of a constitutional magnitude, but such an argument is unpersuasive.

Although all of the mental health professionals who testified acknowledged to some degree that long-term segregation could negatively impact mental health, they also testified that the actual impacts, and the needed response in mental health treatment would be different for each person.  The same goes for IDOC Defendants such as the four wardens who were named as defendants, who all testified that the appropriateness of segregation was a very inmate and fact specific determination.  Given the highly individualized nature of the need and reasons for segregation, and the highly individualized nature of the mental health implications for each person, it is impossible to say unequivocally, and without evidence beyond Plaintiff's own experience, that Wexford's policy or practice of keeping psychiatrists out of segregation placement decisions caused worse outcomes for mental health.  Even if the Court assumed that Plaintiff presented enough evidence to show that there was an actual policy or practice that was unconstitutional in practice, he has not provided sufficient evidence that this policy or practice directly harmed him.

Mental health providers were not always welcome to comment on security decisions like segregation placement,[8] but when they were invited to participate, both

---

[8] Prior to the Administrative Directive change in May of 2017, it is not clear that the Adjustment Committee or segregation review committees were formally required or allowed to accept input from mental health providers.  As

Wexford and IDOC employees engaged in this process with the Adjustment Committee (discipline), the indeterminate/long term segregation committee and the SMI segregation review committee.  Plaintiff does not have any proof that Wexford was notified that it was insufficient to have members of the mental health team other than the psychiatrists participate in these consultations.  Additionally, there is very little evidence to explain if the participation of the psychiatrists would have provided a different outcome for the hearings.  Even if the psychiatrists participated in the hearings to a greater degree, or if they had developed a practice of attempting to persuade IDOC officials to change the segregation status of an inmate, there is not any proof that such a practice actually would have benefited Plaintiff.

Whatever merit there may be to the argument that Wexford's policy somehow kept the most knowledgeable or qualified mental health professionals from participating in segregation reviews, this theory falls flat because Plaintiff can not connect any such shortcoming to his own situation.  Plaintiff's engagement with the mental health professionals was intermittent and made it difficult for them to accurately assess his mental state.  In 2016 when mental health staff, including Dr. Sylvia Lane Butler, attempted to work with him to assess his mental state and to work towards his goal of being released from segregation, he refused multiple appointments, was non-compliant with prescribed medications, and refused appointments to target medication needs. Ultimately in May of 2017, Dr. Butler notified Dr. Hinton that Plaintiff had disengaged

---

some of the IDOC Defendants testified, in 2015 and 2016, mental health was not a consideration in matters of discipline and security.

with mental health services to the point where he was "PRN'd"[9] from the caseload.  At that time, Dr. Butler noted that he wanted to work towards release from segregation, but she was unsure from a housing perspective what accommodations IDOC had available.

In 2018 and 2019 under the care of Drs. Floreani and Poteat, Plaintiff continued a pattern of sometimes engaging in mental health services, and other times refusing appointments and medications.  During this timeframe, mental health staff participated in multiple disciplinary reviews for Plaintiff and their suggestions concerning segregation time were adopted on multiple occasions.  Plaintiff argues that the participation by mental health was meaningless by reference to two disciplinary proceedings that Wexford employee Melissa Pappas (non-party) participated in during 2018 and 2019.  Specifically, in 2018 while Plaintiff was on a crisis watch, Pappas recommended no segregation time for an offense because she believed that individuals on crisis watch were functioning so poorly they should not be held accountable for actions during that time.  By contrast, in April of 2019, she recommended a year of segregation time for an offense of threatening public officials because she deemed Plaintiff "stable" at that time.  She differentiated the two recommendations on the basis that in 2018 Plaintiff was on crisis watch and in 2019, he was not on crisis watch at the time of the disciplinary incident.  Plaintiff makes much of the fact that Pappas on one occasion recommended no segregation, and on another occasion recommended more

_____

[9] At his deposition, Dr. Hinton described "PRN'd" as an acronym for someone to be seen on an 'as needed' or 'on demand' basis.  "it's usually a term that indicates, as needed, some frequency that isn't specified as a specific time period or follow-up date.  An individual can say, you know, I need to have this service now as opposed to it's scheduled for tomorrow."  (Hinton Dep., Doc. 269-6 at 47:4-8).

segregation. Even if Pappas was mistaken or negligent in making her 2019 recommendation, this is a single incident of one employee rather than a policy or practice of Wexford as a whole.

It is also important to note that Wexford employees were not the only mental healthcare providers who participated in the reviews of Plaintiff's discipline and his segregation status. On multiple occasions IDOC employees participated in different capacities. Drs. Hinton, Butler, and Reister[10] reviewed Plaintiff's status when he corresponded with them in 2016 and 2017, and Dr. Butler indicated in these exchanges that she contacted IDOC administrative staff. Tiffany Hill and Carri Morris (a non-party IDOC social worker who saw Plaintiff on a weekly basis in 2019 or 2020) also participated extensively in Plaintiff's SMI segregation reviews, and later in the development of his transition plan to move from segregation to administrative detention and then to protective custody. Thus, despite Plaintiff's arguments that the burden fell on Wexford to provide mental health input in the disciplinary and segregation process, it is clear that Wexford was not responsible for undertaking this role alone.

Causation is a critical component of a *Monell* claim. Plaintiff has not created a genuine dispute of material fact about the causal link between Wexford's alleged policy or practice of failing to participate in segregation reviews, and his actual confinement in segregation. Absent a showing of causation, the Court finds it appropriate to grant summary judgment in favor of Wexford.

---

[10] Dr. Shane Reister was an IDOC regional director who corresponded between Dr. Hinton and Dr. Sylvia Butler in 2016 and 2017 about Plaintiff's inquiries to the Governor's Office concerning his segregation placement, and his mental health care.

Plaintiff's Motion for a Hearing (Doc. 304) will be denied because the Court found the record sufficient to resolve the claims without hearing.  Local Rule 7.1(h)(4).

DISPOSITION

Defendants Motion for Summary Judgment (Doc. 268) is **GRANTED**.  Plaintiff's Motion for a Hearing (Doc. 304) is **DENIED**, because the Court found it unnecessary to resolve this motion.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Floreani and Wexford at the close of this case.

**IT IS SO ORDERED.**

Dated: February 20, 2023

_____
DAVID W. DUGAN
United States District Judge