IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MAURICE L. WALLACE,              )
                                                )

                            Plaintiff,    )
                                                )

vs.                                         )
                                              )

ROBERT JEFFREYS,            )
DOUG SIMMONS,              )
ROBERT MUELLER,            )
JOHN EILERS,                  )
FRANK LAWRENCE,           )   **Case No. 17-cv-576-DWD**
KIM BUTLER,                  )
JACQUELINE LASHBROOK,    )
ALEX JONES,                  )
ALYSSA WILLIAMS,           )
MELVIN HINTON,              )
JOSHUA SCHOENBECK,       )
JASON HART,                  )
SANDY WALKER,              )
STEVE RATHKE,              )
TIFFANY HILL,               )
BILL WESTFALL,              )
LISA GOLDMAN,             )
WEXFORD HEALTH SOURCES, INC.,  )
CHRISTINA FLOREANI.       )
                                              )
                          Defendants.   )

## <u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

Plaintiff Maurice Wallace, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Menard Correctional Center ("Menard"), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred in relation to his continuous placement in solitary confinement or restrictive housing from 2006 until recently.  Plaintiff alleges that he has been held in solitary

confinement or restrictive housing without adequate mental healthcare, without adequate conditions of confinement, without sufficient reviews of his placement, and in violation of the Americans with Disabilities Act and the Rehabilitation Act. Plaintiff's complaint focuses on two groups of defendants: employees of IDOC (Jeffreys, Simmons, Mueller, Eilers, Lawrence, Lashbrook, Butler, Jones, Schoenbeck, Hart, Walker, Rathke, Hill, Westfall, Goldman, Williams, and Hinton) ("IDOC Defendants"); and Christina Floreani and Wexford Health Sources, Inc. (the Wexford Defendants).

On August 1, 2022, the IDOC Defendants moved for summary judgment. (Doc. 280). Plaintiff responded (Doc. 285), and the IDOC Defendants replied (Doc. 302). The matter is now ripe for consideration. The Court also has a pending Motion for Summary Judgment filed by the Wexford Defendants (Doc. 268), but that motion will be addressed separately to avoid confusion. Although the Court does not take the allegations lightly, for reasons explained herein, most of Plaintiff's claims are insufficient to proceed beyond summary judgment against the IDOC Defendants. The procedural due process claim will proceed against Defendants Simmons, Eilers, Lawrence, Lashbrook, Butler, Schoenbeck, Hart and Walker, but summary judgment will be granted on all other claims.

## PROCEDURAL HISTORY

Plaintiff initiated this litigation on June 1, 2017, at which time he filed a pro se complaint. District Judge David Herndon (ret.), who was initially assigned this matter, designated Plaintiff as someone with 'three strikes' under 28 U.S.C. § 1915(g), but the Seventh Circuit Court of Appeals overturned that determination, and Plaintiff was allowed to proceed. On July 31, 2018, the case was returned from the Court of Appeals,

and counsel was appointed assist Plaintiff with this matter.  By October of 2018, counsel had appeared on Plaintiff's behalf, and an amended complaint was in the works.  After multiple rounds of amendment, the operative complaint—the Fourth Amended Complaint—was accepted by the Court and service of process issued.  (Doc. 152).

As the operative pleading, the Fourth Amended Complaint sets forth six claims:

| Claim 1: | Eighth Amendment conditions of confinement claim against Defendants Jeffreys, Simmons, Mueller, Eilers, Lawrence, Lashbrook, Butler, Jones, Schoenbeck, Hart, Walker, Rathke, Hill, Westfall and Goldman for the conditions in segregation; |
|---|---|
| Claim 2: | Eighth Amendment deliberate indifference to serious medical needs claim against Defendants Lawrence, Butler, Lashbrook, Jones, Williams, Hinton, Wexford, Floreani for the mental health impact of prolonged segregation; |
| Claim 3: | Fourteenth Amendment procedural due process claim against Defendants Jeffreys, Simmons, Mueller, Eilers, Lawrence, Lashbrook, Butler, Jones, Schoenbeck, Hart, Walker, Rathke, Hill, Westfall and Goldman for insufficient reviews of segregation; |
| Claim 4: | Fourteenth Amendment substantive due process claim against Jeffreys, Simmons, Mueller, Eilers, Lawrence, Lashbrook, Butler, Jones, Schoenbeck, Hart, Walker, Rathke, Hill, Westfall and Goldman; |
| Claim 5: | Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., claim against Defendants Jeffreys, Simmons, Mueller, Eilers, Williams, Hinton, Lawrence, Butler, Lashbrook, and Jones; |
| Claim 6: | Rehabilitation Act (RA), 29 U.S.C. §§ 894-794e, claim against Defendants Jeffreys, Simmons, Mueller, Eilers, Williams, Hinton, Lawrence, Butler, Lashbrook and Jones; |

The IDOC Defendants seek summary judgment on all six claims.  (Doc. 280).  Their motion is supported by a statement of undisputed material facts (SUMF), deposition

testimony (there are depositions of Plaintiff and Defendants Simmons, Eilers, Lawrence, Lashbrook, Butler, Jones, Schoenbeck, and Hinton), and relevant documents (primarily segregation review documents and disciplinary records, as well as some email correspondence).

Plaintiff filed a response to summary judgment (Doc. 285).  However, Plaintiff did not explicitly respond to the Defendant's SUMF, nor did he incorporate his own set of Additional Undisputed Facts in his response to summary judgment.  Instead, Plaintiff filed a freestanding Notice (Doc. 293) with a short factual narrative, a Statement of Material Facts that Preclude Summary Judgment for all Defendants.  (Doc. 286), and an index of exhibits with reports and reviews, emails, deposition excerpts, and two expert reports (Docs. 28, 3007).

The IDOC Defendants have moved to strike (Doc. 301) Plaintiff's joint statement of material facts (Doc. 286), and his Notice (Doc. 293).  The IDOC Defendants also replied to Plaintiff's response.  (Doc. 302).  The IDOC Defendants have also filed a suggestion of death as to Defendant Robert Mueller on October 20, 2022.  (Doc. 308).

Plaintiff has moved for a hearing on the IDOC Defendants' Motion for Summary Judgment and the Wexford Defendants Motion for Summary Judgment.  (Doc. 304).

## FINDINGS OF FACT[1]

### A. Plaintiff's conviction/discipline history

In July of 2006, Plaintiff pled guilty to murder with the intent to injure or kill. (IDOC Def. SUMF ¶3).  While in jail related to those charges, Plaintiff attempted to escape the McClean County Jail, and injured a female officer in the process.  He pled guilty to two felonies related to that escape attempt.  (*Id.*, ¶ 2).  Upon arrival at Stateville Correctional Center, on December 15, 2006, Plaintiff attacked a correctional officer as they attempted to extract him from his cell.  On that occasion, he struck the officer multiple times in the helmet and body with a homemade weapon made out of a window crank.  (*Id.*, ¶ 6).  As a result of the December 2006 incident, Plaintiff received an indeterminate term of segregation.  (*Id.*).  Plaintiff was transferred to Tamms Correctional Center, where he remained in indeterminate segregation until his transfer in 2012 or 2013 to Menard Correctional Center.  Plaintiff remained in indeterminate segregation at Menard until sometime in recent years it was discontinued.[2]  Specifically, it appears from segregation review documentation that in September of 2018, Plaintiff was notified via memorandum that his indeterminate segregation would end, and that he had a segregation out-date of January 30, 2026.  (Doc. 280-4 at 2).  At the next

---

[1] The Findings of Fact are a combination of Defendants' SUMF, documentary evidence, and deposition testimony. The findings are not disputed unless noted.

[2] Some of the long-term segregation review documents show a segregation out-date of December 15, 2020.  (Doc. 280-5 at 7-8).  However, in recent preliminary injunction proceedings, Plaintiff's counsel argued in February of 2022 that there was a risk of Plaintiff's long-term segregation being terminated immediately without transition programming to help him integrate into general population.  (Doc. 245 at 3).  In the IDOC Defendants' SUMF, they indicate that Plaintiff transitioned from long-term segregation to administrative detention, and then he was released from there to protective custody.  (IDOC SUMF, ¶ 22, n.4).  Exact dates are not given for the transition to administrative detention and then to protective custody.

documented segregation review, in March of 2019, Plaintiff's segregation records reflect an out-date of July 30, 2026.  (Doc. 280-4 at 73-74).   At some point, Plaintiff was placed in a transition program, and he now resides in protective custody.  (IDOC SUMF, ¶22-24, n. 4).

During his years of segregation, Plaintiff received multiple additional disciplinary infractions.  From the time he entered segregation until May of 2020, Plaintiff received discipline on 32 occasions for various reasons, with some incidents resulting in multiple disciplinary infractions.  (Doc. 287-2 at 1-6).  Of these occasions, 8 incidents included fighting or assault.  Most recently, in April and May of 2020, Plaintiff was found guilty of fighting on the yard and attempting to punch another inmate thru cell bars.  (*Id*. at 6, Doc. 280-5 at 40-44, 33-37)[3].  Also of note, on April 8, 2019, Plaintiff was found guilty of sending threatening communications to Illinois officials.  (Doc. 287-2 at 6; Doc. 280-5 at 75-81)[4].

### B.  Segregation reviews

The type and frequency of segregation reviews has fluctuated over time.  Records were provided for reviews dating back to December of 2009.  On December 2, 2009, Plaintiff received a memo that stated per the Deputy Director, his time in segregation was reviewed and would be continued.  (Doc. 280-4 at 9).  It appears that Plaintiff had

---

[3] On both occasions, mental health recommended reduced segregation sentences based on Plaintiff's status as "Seriously Mentally Ill" (SMI), and the possibility hat long term restrictive housing could contribute to his decompensation.  (Doc. 280-5 at 35-36, 43-44).  The Adjustment Committee accepted these recommendations and approved 30 days, and 45 days of segregation for these two incidents.  SMI is an administrative designation that an inmate can receive either based on specific diagnoses (a psychotic disorder, bipolar disorder, or major depressive disorder), or based on an assessment of overall functioning or placement on crisis watch.  (Hinton Dep., 269-6 at 40-41; Pappas Dep., Doc. 269-17 at 32:6-23).

[4] The mental health professionals recommended a year of segregation for this incident, but the Adjustment Committee ultimately only imposed 6 months of C Grade, segregation, and commissary restriction.  (Doc. 280-5 at 75, 80-81).

quarterly reviews at Tamms, and that every six months the Deputy Director would review his indeterminate segregation status.  Reviews of these two types occurred on at least 17 occasions from December of 2009 through December of 2012.[5]  During the December 4, 2012 review period, Plaintiff submitted a written statement and supporting evidence wherein he sought release from segregation.  (Doc. 280-5 at 106-114).  He argued that he had made tremendous amounts of progress in almost six years of indeterminate segregation, his behaviors had been successfully modified, and thus he should be gradually returned to general population.  Despite Plaintiff's statement, the Adjustment Committee determined that "based on the seriousness of the offense on December 15, 2006 – 100 – violent assault of any person and subsequent violations including 206-intimidation or threats," he should be continued in indeterminate segregation.  (Doc. 280-4 at 98).  The committee's recommendation was approved by the Deputy Director.

Plaintiff's first indeterminate segregation review at Menard occurred on August 29, 2013.  (Doc. 280-4 at 81-82).  At that review, Plaintiff apparently stated "I don't want to come out of seg," so the Committee recommended that he be continued in indeterminate segregation based on his own statement.  (*Id.* at 82).  The Deputy Director approved.  (*Id.* at 80).  At reviews in January and July of 2014, Plaintiff indicated he wanted to stay in segregation, or refused to participate.  (*Id.* at 59, 72).  He was continued in segregation.  On July 17, 2014, Butler noted that he had "continued poor adjustment"

---

[5] The record contains documentation of reviews on March 9, 2010, May 18, 2010, June 15, 2010, September 9, 2010, December 10, 2010, December 21, 2010, March 9, 2011, May 18, 2011, July 19, 2011, October 14, 2011, November 20, 2011, December 15, 2011, March 13, 2012, June 25, 2012, September 11, 2012, and December 4, 2012.  (Doc. 280-4, 98-149).

based on several disciplinary reports during the review period.  (*Id*. at 59).  In January and July of 2015, Plaintiff again refused to be interviewed for his segregation reviews.  It was noted during these review periods that he had "continued poor adjustment" and that he had new discipline for fighting in June of 2015.  (*Id*. at 36, 48-49).

There is no documentary evidence of a review in early 2016.  However, in February of 2016, Plaintiff sent correspondence to public entities including the Governor's Office about his confinement at Menard.  The Governor's Office forwarded Plaintiff's inquiry to Melvin Hinton, the Chief of Mental Health for IDOC.  (Doc. 287-20 at 3-4).  The details of Plaintiff's inquiry, and Hinton's response will be discussed in depth in the analysis section below.  The record contains related emails, as well as Hinton's own deposition testimony about the inquiry.  Plaintiff sent additional correspondence to Hinton in November of 2016, and January of 2017.

On July 26, 2016, Plaintiff refused to attend or provide input for his segregation review.  (Doc. 280-4 at 25-35).  The review committee, which included Hart, recommended continued segregation based on the "nature of the offense," and Warden Butler approved.[6]  (*Id*. at 27).

In support of his January 2017 indeterminate segregation review, Plaintiff stated "I don't want out of seg would like a seg out date to work towards.  I have been in seg for 10 yrs I don't know if I can make it in population or with a cellie.  I need counseling and I have been taking meds."  The committee, which included Hart, recommended

---

[6] The committee did not acknowledge that the underlying documents for the segregation review noted new discipline for fighting on May 28, 2016.  (Doc. 280-4 at 25).

continued segregation based on Plaintiff's own statement that he "can't do population." Lashbrook approved without comment, and the Deputy Director approved. (Doc. 280-4 at 24).

In June of 2017, the record contains Plaintiff's first "Seriously Mentally Ill Segregation Review Committee Summary." (Doc. 280-4 at 16). Committee members, which included Defendant Hill, wrote that "based on the review of mental health chart and in consideration of I/m's diagnosis and IDR's it is recommended no seg cuts at this time due to behaviors and non compliance. No recommendations for indeterminate seg committee." (*Id.*). Lashbrook approved with the additional note that "disp has improved, but non-compliance with MH plan."[7] (*Id.*).

For the July 2017 indeterminate segregation review, Plaintiff stated "I would love to come out of seg and go to AD status I have been indeterminate for 10 years[.]" (Doc. 280-4 at 20). Committee member Hart recommended a continuation of indeterminate segregation with no reason offered, and Lashbrook approved without comment. (*Id.*). The supporting documentation showed there had been no new discipline since July of 2016. (Doc. 280-4 at 18).

In October of 2017, Plaintiff refused to participate in the indeterminate segregation review and told the officer "F*** that Sh**." (Doc. 280-4 at 15). Committee member Hart recommended continued segregation based on Plaintiff's refusal to participate, and Lashbrook approved with the comment that Plaintiff failed to cooperate with the review

---

[7] Correspondence between Dr. Hinton and non-party IDOC psychologist Sylvia Lane (Butler) indicated that as of May 2017, Plaintiff had refused as many as five mental health appointments and he was refusing medications. (Doc. 280-17 at 7, emails between Butler and Hinton).

committee. (*Id.*). The supporting documentation included a notation that "SMI RASHO Committee reviewed June 28, 2017 and had no recommendations for the indeterminate segregation committee." (Doc. 280-4 at 14).

On March 8, 2018, the SMI review committee, which included Defendant Goldman, recommended no changes. The rationale provided was identical to the June 28, 2017, notes, with the exception that no comment was made about indeterminate segregation. (Doc. 280-4 at 12, 16). Lashbrook approved without comment. (Doc. 280-4 at 12).

Plaintiff refused to attend the March 2018 indeterminate segregation review, and committee member Hart recommended that his segregation be continued based on the nature of the offense. Lashbrook and Deputy Director Mueller approved without comment. (Doc. 280-4 at 11).

In support of the July 2018 indeterminate segregation review, Plaintiff stated, "he is ready to leave seg. I've not received a ticket approx. 2 yrs ago. I've been in indeterminate seg since 2006. I'm ready to come out." (Doc. 280-4 at 7). The reviewer noted he "is SMI." (*Id.*). Committee member Hart recommended continued segregation because "offender has history of violent/aggressive actions regarding staff." Lashbrook and Deputy Director Mueller approved without further comment. In support of the review, Hill prepared a mental health disciplinary review form where she noted Plaintiff was stable at the time of the review and capable of completing segregation time, so she recommended continued indeterminate segregation. (Doc. 280-4 at 8-9).

The July 2018 SMI segregation review recommended a one-month C-grade cut, with no recommendation concerning indeterminate segregation. The committee included Hill, and the one-month cut was approved by Lashbrook without further comment. (Doc. 280-4 at 3).

There are two memos from September of 2018 concerning segregation. The first, dated September 18, 2018, stated "your indeterminate segregation status has been reviewed by the Deputy Director and will not continue. Released from indeterminate SEG, current segregation will end 1/30/2026." (Doc. 280-4 at 2). The second, dated September 19, 2018, stated "your indeterminate segregation status has been reviewed by the Deputy Director and will continue. Next review will be 90 days." (*Id.* at 1).

There is no documentation for a segregation review in the winter of 2018. The next review is an SMI segregation review dated February of 2019. The form has stock language, "based on a review of the offenders mental health records, disciplinary record, mental health diagnosis and behavioral choices it is recommended the offender does not receive a seg cut." (Doc. 280-5 at 71). The review is signed by Lawrence in his capacity as a Warden without comment. (*Id.* at 71-72).

In the March 2019 long-term segregation review, Plaintiff's segregation outdate is noted as July 30, 2026. The form was prepared by Hill. (Doc. 280-5 at 73). Plaintiff stated "I think it is time for me to be done with seg and go into transition into general population." (*Id.* at 74). Committee members Schoenbeck and Walker recommend continued placement in segregation because proper discipline was administered. Lawrence concurred as Warden without comment, and Deputy Director Eilers approved.

(Doc. 280-5 at 74).  In April and June of 2019, Plaintiff went before the Adjustment Committee for discipline related to his April 2019 threats to public officials, and in relation to allegedly flooding his cell via his toilet.  (Doc. 280-5 at 75-81, 65-70).  He received 6 months of segregation for the threats, and 1 month of segregation for the flooding.  (*Id.*).

In October of 2019, the SMI segregation review committee recommended no changes to his segregation without comment.  (Doc. 280-5 at 63).  Lawrence approved the recommendation as Warden.  (*Id.*).  In November of 2019 the SMI segregation review committee recommended no changes because subsequent offenses in May of 2019 had increased the total segregation time by five months and two weeks.  (Doc. 280-5 at 49).  Lawrence approved without comment.

In January of 2020, the SMI segregation review committee recommend a six-month segregation cut based on compliance for at least five months.  Lawrence approved the cut without comment.  (Doc. 280-5 at 57-58).  In February of 2020, the SMI segregation review committee recommended another cut of 30 days, and then-Warden Jones approved without comment.  (Doc. 280-5 at 54).  In April of 2020, the SMI segregation review committee recommended a 30-day cut, and Warden Wills (a non-party) approved the cut without comment.  (Doc. 280-5 at 53).

A long-term segregation review that spanned March and April of 2020, reflected Plaintiff's request to "be released from seg for something [he] didn't do."  (Doc. 280-5 at 52).  His segregation out date was listed as July 30, 2026.  (Doc. 280-5 at 51).  Committee members Schoenbeck and Walker recommended "continue segregation placement based

on inmates disciplinary history. Proper discipline was administered." (*Id.*). Warden Wills approved and commented "recommended 6 months reduction to release prior to MSR. No significant discipline since April 2019". Deputy Director Simmons approved without comment. (*Id.*).

During a June 2020 SMI segregation review, the committee noted "long term restrictive housing could contribute to the decompensation of offender. For this reason Mental Health is asking for a reduction or the termination of time spent in restrictive housing. Seg out date: 12/15/20." The review also contains a security note, "ticket on 5/23/20 (assault) no reduction recommended at this time." Based on the cumulative information, the committee recommended no reduction, and Warden Wills approved without comment. (Doc. 280-5 at 30).

In support of the June 2020 long term segregation review, Plaintiff stated, "I have been in seg for 15 years. I am ready to get out." (Doc. 280-5 at 24). Plaintiff's segregation out date was listed as **December 15, 2020**[8]. Committee members Schoenbeck and Walker recommended continued segregation because "I/M Wallace has received a significant segregation time cut within the last 90 days. I/M Wallace has also been found guilty of two DR's for aggressive behavior towards other inmates in the last 90 days. Committee recommends more observation." Warden Wills concurred with the comment that based on disciplinary record during the review period, continued observation was needed. Deputy Director Simmons concurred without comment. (*Id.*).

---

[8] The record does not provide a clear explanation of the move of the out-date from July 30, 2026 at the March 2020 review, to December 15, 2020, at the June 2020 review. Compare Doc. 280-5 at 51 with Doc. 280-5 at 23.

From July 29, 2020, through September 30, 2020, the SMI segregation review committee reviewed Plaintiff's situation on 9 occasions (on a weekly basis). (Doc. 280-5 at 9-20). No changes were suggested during these reviews. On September 23 and 30 of 2020, the committee noted that Plaintiff "does not wish for a reduction at this time." (Doc. 280-5 at 9, 11).

Regarding the September 2020 long term segregation review, Plaintiff stated "I am ready to go." Committee members Schoenbeck and Walker recommended that segregation time be continued for more observation for the same reasons offered in June of 2020. (Doc. 280-5 at 8). The Warden concurred, and Deputy Director Simmons approved without comment. (*Id*.).

In the October 2020 SMI segregation review, it was again noted that Plaintiff did not want a reduction, and his outdate was listed as December 15, 2020. No changes were recommended. (Doc. 280-5 at 6). In the November 25, 2020, SMI segregation review, it is noted "Mr. Wallace has expressed having considerable anxiety about re-entering general population. He has asked me not to give him a reduction. He does actively engage in treatment. Step down transitioning programming is recommended. Out date is 12/15/2020."[9] (Doc. 280-5 at 4). No changes were recommended.

### C. Defendants' involvement

The IDOC Defendants were named in their individual and official capacity in the Fourth Amended Complaint, with the exception of the Defendants who were retired at

---

[9] It appears that these notes were made by Carri Morris, a non-party IDOC social worker.

the time of the Fourth Amended Complaint.  The retired defendants—Butler, Lashbrook, and Mueller—were named only in their individual capacity.   Deposition testimony was offered on behalf of Defendants Simmons, Eilers, Lawrence, Lashbrook, Butler, Jones, Schoenbeck, and Hinton.[10]  The Court thoroughly reviewed all the deposition transcripts, but it will not recount the testimony other than in specific portions of the analysis below where testimony sheds light on a particular aspect of a claim.  None of the defendants who were deposed indicated a significant personal knowledge of Plaintiff beyond occasional reviews of his file, or the possibility of a passing conversation during a cellhouse tour.  The deposition testimony, though largely unremarkable, gives a good background for the general atmosphere and policies in IDOC and at Menard during the relevant time period.  As many deponents noted, the policies and practices  surrounding segregated confinement and mental health care in the department changed significantly during this time.

Defendant Jeffreys is named in the Fourth Amended Complaint as the Director of the Department of Corrections[11], there is no evidence that anyone ever communicated directly with Jeffreys about this case.  Defendants Simmons[12] and Mueller[13] were listed as Deputy Directors for the Southern Region of the Illinois Department of Corrections.

---

[10] Deposition testimony of Defendant Tiffany Hill (Doc. 269-14) was submitted with the Wexford Defendants Motion for Summary Judgment, so it was also reviewed in the course of this litigation.
[11] Many of the documents in this case bear the names of other directors.  For example, a June 4, 2019 memorandum listed John Baldwin as the Director of IDOC.  (Doc. 280-5 at 68).  For purposes of any individual capacity claims against Jeffreys, this would necessarily limit his potential scope of responsibility.  To the extent that Plaintiff seeks injunctive relief, which will be discussed in greater detail later, it is appropriate under Fed. R. Civ. P. 25(d) for Jeffreys to have automatically been substituted as a party for purposes of injunctive relief.
[12] Simmons retired on December 30, 2020.  (Simmons Dep., 280-6, 49:3).
[13] There is a suggestion of death as to Mueller that will be discussed more later.

Although Defendant Eilers was named as the Chief of Operations for the Illinois Department of Corrections[14], he was also previously a Deputy Director for the Central District, and during that time he approved one of Plaintiff's indeterminate segregation reviews during the break between Mueller and Simmons. Defendant Alyssa Williams was the Chief of Programs and Support Services for IDOC and is in charge of Mental Health and Psychiatric Services. Defendant Melvin Hinton is the Chief of Mental Health and Psychiatric Services.

Defendant Butler was Warden from 2014-2016, Defendant Lashbrook was Warden from January 2017-February 2019. Defendant Frank Lawrence was named as the Acting Warden of Menard at the time of the Fourth Amended Complaint, and he signed off on a number of segregation reviews as Acting Warden. He testified that he was Warden from 2019 to 2020. During the timeframe covered by this lawsuit, Lawrence was also a casework supervisor from 2014-2016, a clinical services supervisor, and then an acting warden of programs. In these roles he also participated in indeterminate segregation reviews by preparing documents for the reviewing committee. (Lawrence Dep., Doc. 280-14, 33:23-34:3). He is no longer acting Warden but is presumably still employed at Menard.

Defendant Jones was named as the assistant Warden of Operations, a role he held from January 2016-January of 2020. In his role as Assistant Warden of Operations he was the chairperson of the segregation review committee from approximately January 2016

---

[14] There is no explanation in the Fourth Amended Complaint or any of the pleadings or exhibits as to what Eilers did as the Chief of Operations that is related to this case.

through January 2020.  From January of 2020 to March of 2020 he was Acting Warden of Menard, and then he retired.

Defendant Schoenbeck is a correctional lieutenant who serves as the head of the Adjustment Committee. (Schoenbeck Dep., 269-11, 17:6-9).  Defendants Hart and Walker were also named as members of the Adjustment Committee and their names appear on various segregation review documents throughout the record.  Defendant Hill held various roles at Menard.  For purposes of the complaint she was named as a member of the SMI segregation review committee, and her name appears on many of the segregation review documents in the record.  Defendants Rathke, Westfall, and Goldman were also named as members of the SMI segregation review committee.  It is not clear that Rathke or Westfall's names appear on any of the documents in the record.  Goldman's signature appears just one time.

CONCLUSIONS OF LAW

A.  **Legal Standards**

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).  Courts generally cannot resolve factual disputes on a motion for summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is

not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted).

### B. Analysis

The Court begins with the same comments it made in relation to Wexford's Motion for Summary Judgment. This case is made complex by the sheer volume of material submitted, by the duration of time involved, by the intertwined nature of the issues presented, and by the subject matter of the allegations presented.[15] Mr. Wallace spent upwards of 5,000 days—or 14 years—in some form of segregation or isolated housing. Despite the initial shock factor associated with 14 years of segregation, the legal analysis was nuanced to consider the potential personal roles of 17 IDOC defendants across multiple years.

All six of Plaintiff's claims are related to the same core contention that he should not have been held in segregation for so long and that segregation caused his mental health to deteriorate. The most central, and clear legal theory for Plaintiff's contentions is the Fourteenth Amendment procedural due process claim about the constitutional

---

[15] As the Court noted with the Order on Wexford's Motion, the record in this case is a bit of a mess. Plaintiff's submissions of 'facts' were offered in varying forms. In his responsive brief on summary judgment, for some reason Plaintiff's counsel cited to the Third Amended Complaint rather than the Fourth. (Doc. 285 at 3). Plaintiff also submitted a joint statement of material facts in response to both IDOC and Wexford's Motions that did not contain proper citations to the record as required by Fed. R. Civ. P. 56(c)(1). Plaintiff also submitted a narrative summary in the form of Notice, which was responsive to both IDOC and Wexford's Motions. (Doc. 93). In addition to these submissions, Plaintiff submitted sealed and unsealed exhibits. (Docs. 287, 300). Despite the difficulties of reviewing this information given the non-compliance with Fed. R. Civ. P. 56, the Court endeavored to review all evidence submitted in this case, and it was all considered as if properly presented in relation to summary judgment. The IDOC Defendants moved to strike Plaintiff's joint SUMF (Doc. 286) and his Notice (Doc. 293) for violations of the Federal Rules of Civil Procedure. Although the Court understands the Defendants frustration and the arguments about non-compliance with the Federal Rules of Civil Procedure, rather than strike Plaintiff's only evidence, the Court considered all of the evidence and materials presented, and to the extent that factual assertions in Plaintiff's joint-SUMF were not disputed, and did have support in the record, those assertions were construed in Plaintiff's favor per Fed. R. Civ. P. Rule 56(e)(2-3). Based on this analysis, Defendants' Motion to Strike (Doc. 301) is denied.

sufficiency of the periodic reviews he received during his term of segregation.  His additional claims about the conditions of his confinement, the mental health care he received, and the ADA and RA are all, in essence, different legal theories attached to the same set of facts.  This being the case, the legal analytical framework for some of the claims had to be stretched from the traditionally conceived theories and analysis to fit the arguments presented in this case.

The Court finds it significant to note prior to delving into the analysis that, although one of the main points of contention in this lawsuit is that segregation was bad for Plaintiff's mental health, there is very little concrete evidence about Plaintiff's mental health.[16]  In fact, neither the Plaintiff nor the IDOC Defendants submitted comprehensive mental health records in the briefing of this motion.  The only comprehensive mental health records are Dr. Floreani's records that were included with Wexford's Motion for Summary Judgment, and that are limited to a period from May 2018 to June 2019.  Along with Wexford's motion, there was also deposition testimony from multiple mental health professionals (both Wexford and IDOC employees), which included the deposition testimony of Drs. Floreani and Thena Poteat, psychiatrists who have recently treated

---

[16] In Plaintiff's joint-SUMF, he alleges his "mental health worsened as a result of his long-term solitary confinement." (Doc. 286 at ¶ 31).  This factual allegation is not supported by any citations to the record.  Plaintiff also alleges in his joint-SUMF that because he was classified as SMI in 2018, after 12 years of segregation, that means that during his solitary confinement he developed a psychotic disorder, major depressive disorder, or bipolar disorder.  (Doc. 286 at ¶ 29).  This factual assertion cites to the deposition testimony of Melissa Pappas and Dr. Poteat, but it is a mischaracterization of their testimony.  As explained in note 3, an SMI designation can be applied based on one of the three identified disorders, based on an individual's functional capacity as scored by an assessment, or based on an individual being placed on crisis watch.  As Dr. Hinton clearly explained, an SMI designation is not a mental health diagnosis.  (Hinton Dep., Doc. 269-6 at 40-41).

Plaintiff.  Additionally, two psychiatric progress notes from Dr. Poteat were submitted.[17] (Doc. 300 at 181-190).

Dr. Floreani's records indicate a diagnosis of PTSD, with reports of some auditory of visual hallucinations and stress.  (Doc. 269-3 at 53, Floreani's notes from November 2018 appointment). Dr. Poteat's testimony about Plaintiff's mental health diagnosis is ambiguous.  (Poteat Dep., Doc. 269-7 at 121:1-122:17; 128:25-130:4).  Significantly, Dr. Poteat described an ongoing effort in 2019 to properly diagnose Plaintiff's mental health.[18]   Aside from Drs. Poteat and Floreani, the record contains a report and supplemental report from Plaintiff's expert, Dr. Stuart Grassian.

Dr. Grassian catalogued symptoms of depression and suicidality, an inability to focus, and perceptual disturbances or hallucinations.  (Grassian Report, Doc. 300 at 23-28).   He did not, however, associate the discussed symptoms with any particular diagnosis, nor did he comment in his initial report on any of the care or services provided by IDOC or Wexford mental health providers.  Rather than discuss any specific diagnosis, Dr. Grassian concluded that IDOC had labeled Plaintiff as SMI, and at times he had been prescribed powerful psychiatric mediations.  Dr. Grassian commented that medications

---

[17] In addition to Dr. Poteat's two progress notes that Plaintiff submitted, in the process of reviewing Wexford's Motion for Summary Judgment, the Court also reviewed a referral to a special treatment unit form completed by Dr. Poteat in November of 2019.  (Doc. 299).

[18] "There—there was—there was just a lot of uncertainty as to whether Mr. Wallace had a primary psychotic illness or whether Mr. Wallace was—had a personality disorder and was attempting to give the indication that he had a primary psychotic disorder.  (Poteat Dep., Doc. 269-7 at 129:23-130:4).  "After reviewing his 6 volumes of medical charts, there seems to be a pattern where Mr. Wallace has used symptoms of mental illness for secondary gain only to have symptoms remit when no longer needed. He would go for long periods of time sometimes years without reference to mental health needs.  He did not take any psychotropic medication until he was 32 y/o. He will not take medication that would typically be used to treat a mental illness of psychosis for very long. He will take Abilify, most of the time, but at low level for adult schizophrenia, 5mg at bedtime. This may help with sleep or depression. However, I feel what would be most helpful would be for Mr. Wallace to under go a full battery of psychological testing to clarify his diagnostic picture and then recommend the most appropriate treatment."  (Doc. 299 at 3, 5).

have proven only "modestly helpful."  Which he characterized as "not surprising," because "[t]here is something almost cynical about such treatment.  It treats the *symptoms*, the *result*, but fails to address the *cause*.   Mr. Wallace's symptoms are entirely characteristic of the profound psychiatric effects of prolonged solitary confinement[.]" (Doc. 300 at 27-28).  In his supplemental report, Dr. Grassian noted that Dr. Poteat had diagnosed Plaintiff with schizophrenia and had prescribed him Abilify.[19]  (Doc. 300 at 113-120).

The scarcity of evidence about the measurable impacts of segregation on Plaintiff makes it difficult for the Court to assess the actual impacts of segregation, or the adequacy of the healthcare or accommodations provided.  Without evidence about Plaintiff's mental state over time, or even about his mental state at present, it is hard to definitively say if long-term segregation caused him significant and lasting harm.

### i.    Statute of Limitations

The IDOC Defendants argue that the majority of Plaintiff's claims are barred by the statute of limitations, which is two-years for cases arising in Illinois.  Defendants contend that Plaintiff initiated this lawsuit on June 1, 2017, so any claim that accrued before June 1, 2015, is barred, and there is no applicable tolling.  Plaintiff counters that his case presents the textbook example of a continuing violation such that he should be allowed to pursue claims for any conduct from December 2006 to present.

---

[19] Dr. Poteat testified that she did not believe diagnoses considered for Mr. Wallace were things caused by his environment.  (Poteat Dep., 269-7 at 143:19-144:10).

In *Isby v. Brown*, a case cited extensively by both sides, the Seventh Circuit affirmed the District Court's finding that claims were limited by the accrual date of the last applicable violation.  Thus, the *Isby* Court considered claims related to segregation reviews that were two years prior to the filing of the complaint, rather than claims that related to the entirety of the plaintiff's term in segregation.  *See Isby*, 856 F.3d at 513, n. 2; *Isby v. Brown*, Case No. 12-cv-116-JMS-MJD (S.D. Ind. 2018) (Docket entry 274, December 19, 2018 Order at p. 4, n. 4) ("This action was filed on May 15, 2012.  At trial, evidence was admitted dating back to 2002, but for purposes of the applicable two-year statute of limitations, the Court will limit most of its discussion to the review procedures that were in place in 2010 and after.").  Here, the Court finds it similarly appropriate to limit Plaintiff's claims to those from June 1, 2015 to date.  Even if the Court were to consider allowing claims from a broader time-period, which it does not think is appropriate, there are no defendants named who participated in Plaintiff's segregation status reviews any earlier than 2015[20], so it would be a moot point to allow broader claims.

### ii.   Official capacity claims

The Defendants argue that the official capacity claims against Defendants Jeffreys, Simmons, Eilers, Lawrence, Jones, Williams, Hinton, Schoenbeck, Hart, Walker, Rathke, Hill, Westfall, and Goldman should not proceed because Plaintiff cannot maintain a claim for money damages against these individuals in the official capacity under the Eleventh

---

[20] The only exception is Warden Kim Butler, but her participation in earlier reviews does not change the overall analysis, nor does it exclude her from potential liability.  Butler participated in reviews that continued into 2015 and 2016.

Amendment.[21]  Plaintiff agrees that he cannot maintain a claim against these individuals in their official capacity for money damages, but he argues that he should be allowed to maintain a claim against them in their official capacity for prospective injunctive relief.

Per deposition testimony, Defendants Simmons and Jones have now retired, so claims for injunctive relief against them are moot.  Simmons was last a deputy director for the Southern Region until December 30, 2020.  (Simmons Dep., Doc. 280-6 at 49:3).  To the extent a Deputy Director is needed to implement injunctive relief, the current Deputy Director (Kim Smith) may be added later.  Jones was last an Acting Warden at Menard. (Jones Dep., Doc. 280-8 at 28).  To the extent that the new Warden (Anthony Wills) is needed to implement possible injunctive relief, he may be added later in Jones' stead.

As for the others—Defendants Jeffreys, Eilers, Lawrence, Williams, Hinton, Schoenbeck, Hart, Walker, Rathke, Hill, Westfall and Goldman, these parties may remain in this lawsuit in their official capacity solely for the purpose of implementing future injunctive relief if the Court determines in the below analysis that a claim proceeds against them.

### iii.    Conditions of Confinement

The Eighth Amendment prohibition on cruel and unusual punishment forbids the unnecessary and wanton infliction of pain. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). To succeed on a claim related to conditions of confinement, a plaintiff must establish both

---

[21] The Court notes that the preferred basis for ruling out claims for money damages against state officials is actually the fact that "[s]uits against states for damages should be resolved on the ground that they do not come within § 1983, not because states are protected by the Eleventh Amendment." *Williams v. Wisconsin*, 336 F.3d 576, 580 (7th Cir. 2003), *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (state officials acting in their official capacity are not "persons" subject to an action for damages under § 1983).

an objective and subjective element. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). As to the objective element, a prisoner must establish that the conditions deny him "the minimal civilized measure of life's necessities," creating an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To do so, he must show that the conditions resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care, sanitation, or physical safety. *See Rhodes*, 452 U.S. at 347.

The subjective component of a claim for unconstitutional conditions of confinement requires demonstrating that a defendant had a culpable state of mind, that is that a defendant acted with deliberate indifference to a substantial risk of serious harm to the prisoner. *See Farmer*, 511 U.S. at 837, 842. While mere negligence does not amount to a constitutional violation, a plaintiff satisfies the deliberate indifference standard by showing that a prison official acted, or failed to act, despite the official's knowledge of a substantial risk of serious harm from the alleged unconstitutional conditions. *See Farmer*, 511 U.S. at 842; *Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). That is, prison officials must act to prevent "unreasonable peril" or to address "preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016).

Plaintiff's conditions of confinement claim is brought in conjunction with his procedural due process claim. Courts have found that although Eighth Amendment conditions and procedural due process claims can co-exist, long-term segregation does not automatically violate the Eighth Amendment. In *Gillis v. Litscher*, 468 F.3d 488, 492

(7th Cir. 2006), the Court reasoned, "there can, in fact, be a liberty interest—short of an Eighth Amendment violation—triggering procedural requirements." *Citing Wilkinson v. Austin*, 545 U.S. 209 (2005). "*Wilkinson* does not answer the question as to when the denial of life's necessities alone could give rise to a liberty interest but still fall short of violation the Eighth amendment. There is, as we said in *Wagner*, a "small space" between the two." *Gillis*, 468 F.3d at 492. In *Townsend v. Cooper*, a plaintiff was allowed to proceed on conditions of confinement and procedural due process claims related to his 259 days in various forms of segregated confinement. 759 F.3d 678, 689 (7th Cir. 2014). By contrast, in *Isby*, Plaintiff was allowed to proceed on a procedural due process claim after an appeal, but his Eighth Amendment conditions claim failed after a bench trial.

A lack of heat, clothing, sanitation, and bedding, alone or in combination, can amount to a violation of the Eighth Amendment. *See Gillis*, 468 F.3d at 493 (collecting cases). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Although conditions of segregated confinement may amount to an Eighth Amendment violation, the impacts of placing a mentally ill inmate in segregation do not automatically equate to an Eighth Amendment violation. *Giles v. Godinez*, 914 F.3d 1040, 1050-51 (7th Cir. 2019). Denial of access to things like law library, visitation, and religious services are not serious enough to make out an Eighth Amendment conditions claim because they are not related to life's necessities—shelter, heat, hygiene, clothing, sanitation, bedding, and utilities. *See e.g., Harvey v. Mason*, 2022 WL 715448 (S.D. Ind. 2022) (collecting cases). "Allowing inmates only two showers and four hours of outside recreation each week does not violate the

Eighth Amendment." *Vasquez v. Braemer*, 586 Fed.Appx. 224, 228 (7th Cir. Sept. 23, 2014) (collecting cases that approved of one shower weekly and three hours weekly of outdoor recreation when indoor exercise was allowed).

The conditions that Plaintiff complained of in his Fourth Amended Complaint are strikingly similar to those considered in *Isby*, and the Defendants argue that per *Isby*, the conditions Plaintiff experienced were not egregious.  Plaintiff complained of a small cell (45 square feet), yard-time in a small area (similar size to his cell), lack of access to contact visits or religious services, limits on materials he can possess (such as photographs), and an overall lack of meaningful interaction.  He alleges that at most times he could not easily communicate through the door, and he was often subjected to constant yelling, crying, and door banging from his neighbors.  His routine interactions were just encounters with correctional officers. He took all of his meals alone in his cell.  To leave his cell, he was always subject to a strip search.  During yard time, he often walked in circles and talked to himself.

At his deposition, Plaintiff further described some of the limits of segregation. He described a segregation cell as: "about the size of a closet with a wash basin, a toilet, a steel bunk.  Hot in summer, cold in winter. Always loud. Always dirty." (*Id.* 47:13-16). He stated he is not allowed to have a television[22], and he can only have a limited number of pictures.  (Wallace Dep., Doc. 269-8, 22:24-23:7).  He stated that he can have non-contact visits thru plexiglass, but he generally does not have phone privileges.  (*Id.*, 23:18-25).  He

---

[22] Dr. Grassian reported in his supplemental report that Plaintiff now has a television which he watches a few hours a day.  (Doc. 300 at 114).

was allowed to leave his cell for medical or mental health appointments.  (*Id.*, 44:18-19).

Early in his segregation time he only got one shower a week, but around 2017 it changed

to two or three showers a week.  (*Id.*, 45:4-6).  He stated that in his cell he can do yoga,

but he does not always feel up for it.  (*Id.*, 46:17-22).  He stated he has not made any

friends, but he has a good relationship with security staff in North Two.  (*Id.*, 47:2-5).

Plaintiff testified that he has never met or communicated with Defendants Simmons,

Mueller, Eilers, Walker, Rathke or Hill.  (*Id.*, 52: 12-64:6).  He has never met Jeffreys or

Williams, though he may have written them about his segregation.  He believed he had

met Goldman, who he thought was a psychologist.  (*Id.*, 64: 2-3).  He interacted with

Lawrence, Butler, Lashbrook, Jones, Schoenbeck, and Westfall during cellhouse rounds,

and he believes he may have spoken to them about his segregation.  He also indicates he

may have met Hinton during cellhouse rounds, and he once wrote Hinton about the

quality of his mental health care.

By comparison, Mr. Isby's cell was about 80 square feet, which allowed just

enough space for some in-cell exercise like push-ups.  *Isby-Israel v. Lemmon*, 2015 WL

5672702, *2 (S.D. Ind. 2015).  Mr. Isby was in his cell about 23-hours a day, but was

allowed out for social visits, attorney visits, medical appointments, yard, showers (3x per

week), and meetings with staff.  He had a television.  He got one twenty-minute call a

week, and he was supposed to get five hours of yard time a week, though that varied

with staffing.  He could attempt to communicate with others from cell to cell or during

yard, but he sometimes opted to keep to himself.  There were lights on 24 hours a day,

but inmates were allowed to cover their face to sleep.  He also alleged the bedding was

uncomfortable, he was not always satisfied with the clothing he got, the meals were insufficient, and his mail was often searched.  He was seen at periodic intervals for mental health services, but he did not have documented mental illness and typically expressed a desire not to engage in services.

On the evidence presented, the Court is not convinced that the conditions themselves were so severe as to amount to an Eighth Amendment deprivation.  Eighth Amendment conditions of confinement claims focus on the deprivation of the very essentials for life including shelter, food, clothing, heat, and sanitation.  A single condition, or a combination of conditions can amount to an Eighth Amendment violation. Here, although Plaintiff undoubtably has identified many unpleasantries, many of the complaints he raises about segregation do not go to an identifiable essential of civilized life.  For example, a limit on the number of pictures, or a limit on contact visits has nothing to do with the essentials of survival.  Plaintiff makes much of the total social isolation, but at his deposition he also stated he had a good relationship with security staff in his housing unit, and he would have been able to talk to others on yard if he wanted to, he just often chose not to talk.  Whatever the serious consequences may be of social isolation, the social isolation described by the Plaintiff alone does not equate with the deprivation of life's necessities.

Additionally, even if the Court concluded that Plaintiff identified constitutionally deficient conditions of confinement, he has not adequately associated these allegations with any of the named defendants, as is required for personal liability under Section 1983. Notably, he agreed at his deposition that he had never spoken to, and did not know

Defendants Simmons, Mueller, Eilers, Hart, Walker, Rathke or Hill, and he had very limited interactions with other Defendants mainly during cellhouse rounds tailored to inquiries about his placement in ongoing segregation.  The record does not contain further correspondence or evidence that shows Plaintiff communicated with any of the IDOC defendants personally about the conditions of his cell(s) during his time in segregation.  The parties in this case did not litigate the exhaustion of administrative remedies, so the Court has no information about grievances Plaintiff filed related to this case other than passing mentions that he knew about the grievance procedure and understood how to use it.  Without concrete evidence that any of the named defendants were informed about the constitutionally infirm conditions of Plaintiff's confinement, Plaintiff cannot reasonably maintain a claim against these individuals in their individual or official capacities for his conditions of confinement.

Even if Plaintiff identified constitutionally inadequate conditions and personal involvement of the defendants, with a claim about segregated confinement, the Court must also consider the existence of feasible alternatives.  *See Isby v. Brown,* 856 F.3d 508, 523 (7th Cir. 2017) (the existence of alternatives that the plaintiff failed to engage with was a factor that weighed against a finding an Eighth Amendment violation). The parties discussed the availability of feasible alternatives to the segregated housing.  The Defendants argue that they should be afforded broad deference about housing for Plaintiff both because of his history of aggressive behavior towards staff, and because of his status as a high escape risk inmate.  Plaintiff counters that there is no penological justification for his lengthy stay in segregation or the lack of alternatives because IDOC

has now discontinued all long-term segregation in all Illinois prisons.  Plaintiff also offered an expert report from Stephen Sinclair (an expert on corrections) about more effective alternatives to segregation.  (Doc. 300 at 123-136).

Given that Plaintiff did not clearly establish the personal involvement of any of the IDOC defendants, the Court finds it unnecessary to discuss feasible alternatives in great detail.  However, it should be noted that hindsight and the existence of alternatives today do not prove that the IDOC Defendants were required to have handled Plaintiff's segregation differently in the past.  As can be seen by reviewing the fact section and Plaintiff's disciplinary record, different solutions or options may have been appropriate at different times during his incarceration, and like in *Isby*, Plaintiff's willingness to engage in things mattered.  At times Plaintiff sought to engage in treatment, or to engage with review committees to seek a reduction of his segregation, but at other times he refused services, continued to commit disciplinary violations, and asked to be kept in segregation or protective custody.  As will be discussed in the Eighth Amendment deliberate indifference to medical needs section, Plaintiff wrote to the Governor's Office and Dr. Hinton seeking a release from segregation, but then when contacted by mental health services, his participation in the offered services was only intermittent.  In fact, at times, he explicitly asked not to be released from segregation.  Thus, the existence today of possible alternatives says very little about the appropriateness of past conditions of Plaintiff's confinement in segregation.  Additionally, Plaintiff's own varying degrees of participation with services or programming that may have allowed him a change in

housing, and his continued disciplinary infractions over time detracts a finding that there were feasible alternatives.

In sum, the Court grants summary judgment in favor of all IDOC defendants on the Eighth Amendment conditions of confinement claim because the evidence does not establish a genuine dispute of fact about the constitutionality of the specific conditions or group of conditions, or the personal involvement of the named Defendants in those conditions.

### iv.   Eighth Amendment Deliberate Indifference to Mental Health

Section 1983 provides a private right of action against persons acting under color of state law who violate constitutional rights.  42 U.S.C. § 1983.  Prison officials and medical staff violate the Eighth Amendment's prohibition on cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs.  *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017).  To prevail on an Eighth Amendment claim of constitutionally-deficient medical care, a prisoner must satisfy a two-part test.  *Id.*  He must establish that he had an objectively serious medical need.  *Id.* The second, subjective prong requires a prisoner to show that the defendant had knowledge of facts from which he or she could infer that a substantial risk of serious harm exists and then disregards that risk.  *Id.* at 476.  The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one.  *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014).

A prison administrator may only be held responsible for deliberate indifference to a medical condition if he or she "knows about unconstitutional conduct and facilitates,

approves, condones, or 'turn[s] a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015).  An official may reasonably rely on the judgment of medical officials in his or her investigation of a complaint about medical care. *Giles v. Godinez*, 914 F.3d 1040, 1049-50 (7th Cir. 2019).  If records show that medical professionals are providing ongoing treatment, and there is nothing to give officials notice of inadequate care, then administrators are not deliberately indifferent to a need for care. *Id.* at 1050.

In the Fourth Amended Complaint, Plaintiff alleges that Defendants Lawrence, Butler, Lashbrook, Jones, Williams, and Hinton were deliberately indifferent to his serious need for mental health care.  The Defendants argue that they are administrators entitled to rely on the judgment of treating professionals, and that Dr. Hinton never provided direct treatment to Plaintiff, so he could also defer to others.  In support of this argument, they oddly cite to deposition testimony of Defendants Simmons and Eilers (both former Deputy Directors who are not named in this claim) who testified at that they would always defer to mental health professionals about the impacts of segregation on mental health.

In response, Plaintiff contends that his claim was not that he received no mental health care, but that he did not receive care that treated the root cause of his mental health issues—the root cause being ongoing placement in segregation.  Because the risks of prolonged isolation were known, and Defendants did not consult mental health professionals as they continued to impose segregation, Plaintiff argues that Defendants cannot seek summary judgment on the notion they could defer to treating professionals.

To some extent, this claim seems like an afterthought on summary judgment for both sides.  Crediting Plaintiff's version of his argument, that Defendants were wrong for knowingly exposing him to the serious mental health risks of prolonged segregation, rather than that they were wrong for providing inadequate mental health care, his selection of defendants does not make a lot of sense.  He named four Wardens who oversaw his terms of segregation, but he did not name any of the Deputy Directors who were the final decisionmakers on segregation, nor did he name any of the committee members from the Adjustment Committee or the SMI segregation review committee that directly interacted with him and made recommendations to the warden.  He also did not name any mental health professionals (other than Dr. Floreani) that gave him more direct care on a daily basis, and thus would have been in a better position to inform the wardens, or others of his mental health status. Setting aside the odd selection of defendants, Plaintiff has also not made it clear how the four former Wardens were personally aware of his need for mental health care.

At his deposition, Plaintiff testified that to the extent he interacted with the four former wardens, he spoke with them about his segregation, with no specific emphasis on an expressed desire for different mental healthcare.  For a prison administrator to be held liable for deficient medical or mental health care, it must be shown that he or she knows of a serious risk and allows it to continue or otherwise turns a blind eye to it.  *Perez*, 792 F.3d at 781.  As the defendants argue, administrators are allowed to defer to treating professionals.  There is no clear evidence that Plaintiff made these wardens aware of his mental health issues and notified them of a desire for different care.  At most, the record

shows that the warden defendants signed off on segregation review documentation that may have been prepared with reference to notes or input from mental health staff.

This assessment does not apply to Defendant Butler, who was Warden from 2014-2016, prior to the time when Department Rule 504 changed on April 1, 2017 to require input from mental health about segregation. DR 504.II.I.3-5 stated that if clinical indications suggest that continued placement in segregation could pose an imminent risk to an offender's mental health, then the facility mental health authority shall review that information and make recommendations to the CAO, who, shall submit the issue to the Deputy Director if there is a disagreement. (Doc. 269-15). This policy came to fruition after Butler's time, and Butler testified that at the time she was Warden, mental health did not play a role in determining the term of segregation for an offender.

Butler first signed off on a segregation review on January 21, 2015, where it was noted that Plaintiff refused to attend the hearing, and he would be continued on segregation for the safety and security of the institution based on tickets over previous years.[23] Butler next signed off on a segregation review on July 16, 2015, with a note that Plaintiff's segregation would be continued for "continued negative adjustment." (Doc. 280-4 at 36-48). During the reporting period, in June of 2015, Plaintiff received discipline for fighting. (*Id.* at 36). Butler also signed off on a segregation review on July 26, 2016, that again continued segregation, with a note that Plaintiff had discipline for fighting in May of 2016. (*Id.* at 25-27). In the process of conducting these reviews, there is no

---

[23] This review falls outside the statute of limitations as defined earlier by the Court.

evidence that Butler learned Plaintiff's mental health had suffered. Although she independently testified at her deposition that she did not personally agree with all aspects of segregation, she indicated she did not have control to change some of the things she did not agree with. (Butler Dep., Doc. 280-11, 21:5-8). On the whole, there is not clear evidence that Butler knew Plaintiff suffered any personal deterioration to his mental health based on ongoing segregation, and thus, there is also no indication she failed to respond to any such need for mental health care that she was not aware of. Accordingly, summary judgment is warranted in Butler's favor on Claim 2.

Turning to the other three wardens, Defendant Lashbrook signed off on segregation reviews on January 18, 2017, July 12, 2017, October 3, 2017, March 26, 2018, and July 17, 2018. During this timeframe, SMI segregation reviews began, and she also signed off on those on June 29, 2017, March 8, 2018, and July 26, 2018. In those three reviews, the committee, which had a mental health representative, recommended based on a review of Plaintiff's mental health file, his diagnosis, and his behavior, that no reduction in indeterminate segregation be made. (Doc. 280-4 at 3, 12, 16). On the first of these reviews, Lashbrook noted that Plaintiff's discipline had improved but that he was not in compliance with his mental health plan. Based on this available record evidence, it cannot be said that Lashbrook was deliberately indifferent specifically to Plaintiff's mental health needs, or the impacts of segregation on his mental health. The mental health representative on the SMI review committee advised that she did not believe recommendations should be made at that time on Plaintiff's indeterminate segregation,

and there is no apparent reason given why Lashbrook should have doubted this advice. Accordingly, summary judgment will be granted in favor of Lashbrook on Claim 2.

Despite his short tenure as Warden, Lawrence signed off on quite a few documents related to Plaintiff's segregation, including multiple documents that included input from mental health. Notably, he signed off on two Adjustment Committee recommendations that Plaintiff receive reduced disciplinary sanctions for threats to officials (Doc. 280-5 at 75-76) and flooding his cell (*Id.* at 65-66). He also approved an SMI segregation committee recommendation for a six-month segregation cut (Doc. 280-5 at 57). Given that Defendant Lawrence accepted recommendations from mental health when they were given, and granted the recommended reductions in segregation time, there is not evidence that demonstrates he subjectively ignored Plaintiff's mental health needs in relation to the imposition of segregation. Accordingly, summary judgment will be granted in favor of Lawrence on Claim 2.

As to Jones, there is just one SMI segregation review that he signed off on as Warden. On February 11, 2020, he approved a recommendation for a 30-day reduction of Plaintiff's segregation term. (Doc. 280-5 at 54). During the time when he was an assistant warden of operations, from approximately January 2016-January of 2020, Jones testified that he participated as a chairperson of the segregation review committee, but none of the record exhibits for segregation reviews of Plaintiff bear his signature, so the Court was unable to specifically assess recommendations made at review hearings. Additionally, at his deposition, Jones was asked about a December 2016 email with Lawrence, wherein he agreed a month in advance of a segregation review committee

hearing that Plaintiff should remain in segregation due to the nature of his underlying conduct (attacking an officer). (Jones Dep., Doc. 280-8 at 74:4-75:14). He further explained that the input he provided to Lawrence was from a security perspective, because security was within his purview at the time of the email, and he believed from a security perspective continued segregation was appropriate. And Plaintiff points to nothing in the record to support a finding of subjective intent by Jones concerning Plaintiff's mental health needs. Accordingly, summary judgment is warranted on behalf of Jones on Claim 2.

As for Williams, Plaintiff testified he may have written her about his situation, but he was not sure. Neither party provides a clear picture of Williams role in this case, and there is no deposition testimony, declaration, or other evidence that elaborates on Williams' potential significance to this case. The Defendants argue that the claim against her alleging deliberate indifference to a serious mental health needs must be dismissed, and the Court agrees for the simple reason that deliberate indifference is premised on personal involvement and there is no showing of sufficient personal involvement in the record evidence. Summary judgment is granted in favor of Williams on Claim 2.

By contrast, Defendants argue that the claim against Hinton should also be dismissed because he was not a direct care provider and there are insufficient allegations of personal involvement, but the record belies this argument. There is email and letter documentation in the record, as well as Plaintiff's deposition testimony that he contacted Hinton in 2016 about the quality of mental health care that he received, and Hinton's own deposition testimony.

The emails involving Dr. Hinton began in February of 2016 when Plaintiff sent a letter and supporting documents to the Governor's Office about his placement in continuous segregation that was forwarded to Dr. Hinton for investigation.[24]  (Doc. 287-17 at 2-29).  Dr. Hinton's staff forwarded the inquiry from the Governor's Office to Dr. Sylvia Butler (Lane) (a non-party to this lawsuit) at Menard to check on Plaintiff's status. In response, Dr. Butler stated via email that Plaintiff had not been labeled as SMI, was not on psychiatric medications and was not on the mental health caseload because he had refused appointments.  (Doc. 280-17 at 44-45).  Dr. Butler noted that during December 2015 segregation rounds, Plaintiff allegedly self-reported to staff that he was "doing good."  (*Id.*).  In response, Dr. Hinton's staff asked that a mental health evaluation be completed "as soon as possible" and a brief summary be sent for his review.  (*Id.* at 42-43).

Plaintiff apparently sent additional correspondence to the Governor's Office in November of 2016.[25]  In response to the inquiry from the Governor's Office, Dr. Hinton's staff again contacted Dr. Butler and asked her to "conduct a well-being check, clarify [Plaintiff's] concerns for mental health services and then [s]end Dr. Hinton a brief mental health summary and ensure that the treatment plan is up to date."  (Doc. 280-17 at 17). On November 18, 2016, Dr. Butler sent a detailed reply wherein she indicated that

---

[24] In the letter and supporting documents, Plaintiff asks for daily access to audio-visual devices, media publications, and/or an immediate return to general population.  (Doc. 287-17 at 9-10, ¶ 12).  By contrast, in February 2016 correspondence to the Illinois Inspector General's Office he wrote that he feared for his life if he was released from segregation, because he believed that his underlying criminal case was high profile and that he would be attacked. (Doc. 287-20 at 7-9).  He continued to pursue requests at the prison level for protective custody in the Spring of 2016. (Doc. 287-20 at 14-18).

[25] The correspondence itself does not appear to be in the record, but it is referenced in email communications.

"[Plaintiff" has not worked on MH issues in the past due to his anger at the establishment and requested to be taken off the MH caseload.  He appeared to be in a depressed mood at the time of the visit, agitated and guarded.  [Plaintiff] has expressed that he wants to learn how to live behind bars and is asking for Mental Health's help in doing so.  I reiterated to him that mental health will do a complete evaluation and treatment plan to help him accomplish his goal. He is scheduled to be seen by an MHP in 2 weeks and will also receive a psychiatry referral."  (*Id.*).

During the timeframe of Dr. Hinton's inquiry to Dr. Butler, there is also email correspondence between Defendant Lawrence (while he was an assistant warden), Defendant Jones (during his time as an assistant warden), and Hutchinson (a former warden and non-party).  In an email dated December 9, 2016, Lawrence indicated he had received a phone call from Dr. Butler concerning Plaintiff's release from segregation.  (Doc. 280-15 at 1).  Lawrence wrote that he informed Dr. Butler that Plaintiff was in indeterminate segregation and that he would not be released from that status because of his history of attacking correctional staff.

On January 9, 2017, Plaintiff additionally sent a letter to Dr. Hinton wherein he stated he objected to being released directly from segregation into general population without an ability to decompress or transition.  (Doc. 287-19 at 4).  Dr. Hinton's office reached out to Dr. Butler about this additional letter and asked for an update on his housing placement.  (Doc. 280-17 at 12).  Dr. Butler responded that he was scheduled for an appointment in February of 2017 but refused to be seen.  She reported that he had been engaged in treatment for a few months with the goal of developing coping and

socialization skills for eventual release to general population, and that he had been informed there would be a transition period from segregation to general population. Despite these assurances, she reported he became impatient and did not believe what he was told.  Dr. Butler reported that she contacted the Adjustment Committee about Plaintiff's case, and also planned to discuss her concerns with the Warden.  (Doc. 280-17 at 12).  In April and May of 2017, Dr. Hinton's office asked for updates.  (*Id.* at 11).  On May 11, 2017, Dr. Butler indicated that Plaintiff continued to refuse treatment, discontinued his medications, and refused to meet with a psychiatrist on multiple occasions about his medications, so he was "PRN'd"[26] from the mental health caseload. (Doc. 280-17 at 7).

Dr. Hinton testified that in his view, at the conclusion of the May 2017 correspondence, Dr. Butler opined that Plaintiff wanted to leave segregation, but she was unsure if there was transitional housing available.  (Hinton Dep., Doc. 269-6 at 59:2-18). Dr. Hinton described this as an uncertainty about if someone could stay housed in segregation but receive the privileges of general population inmates.  (*Id.*).  He further testified that at the time of his deposition in 2021, a transition program for inmates leaving segregation had been in place for about a year.  (*Id.* at 59:23-60:18).  The transition program gathered input from mental health, administrative staff, and other stakeholders

---

[26] At his deposition, Dr. Hinton described "PRN'd" as an acronym for someone to be seen on an 'as needed' or 'on demand' basis.  "it's usually a term that indicates, as needed, some frequency that isn't specified as a specific time period or follow-up date.  An individual can say, you know, I need to have this service now as opposed to it's scheduled for tomorrow."  (Hinton Dep., Doc. 269-6 at 47:4-8).

at the prison.  (*Id.* at 61:8-18).  The program was part of the operational directives of the institution and was not a mental health directive or policy.  (*Id.* at 63:22-64:2).

Deliberate indifference requires a showing of an objectively serious medical condition, and subjective disregard to that condition by a care provider.  "Deliberate indifference is a subjective mental state; the official must have actually known of a consciously disregarded a substantial risk of harm."  *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).  The requisite mental state is something approaching "total unconcern for the prisoner's welfare."  *Id.*  "Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference."  *Id.*

In addition to a typical deliberate indifference to medical needs claim against a direct care provider, the Seventh Circuit has also recognized a 'second category' of deliberate indifference medical claims regarding systemic deficiencies in a prison's healthcare services.  "In case of alleged systemic deficiencies, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to medical care.'"  *Rasho v. Jeffreys*, 22 F.4th 703, 717 (7th Cir. 2022) (J. Ripple, dissenting) *citing Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (noting deliberate indifference can be established by a pattern of repeated acts of negligence by staff, or by proving there are systemic and gross deficiencies in the treatment or facilities available).  A systemic problem cannot be shown by pointing to isolated incidents. *Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018) (finding that an inmate failed to establish systemic issues

that fostered an attack by a fellow inmate where Plaintiff had evidence of his own observations of violence, an affidavit from a fellow inmate about fights; an expert report that policy failures and bad practices caused his injury when counterbalanced with evidence that steps were being taken to address the issues).

The parties do not address the first prong of deliberate indifference, an objectively serious condition, so the Court will assume for purposes of this analysis that Plaintiff's mental state was an objectively serious condition.  To show Dr. Hinton's subjective state, Plaintiff must show either that Hinton knew he took inadequate steps to address Plaintiff's needs, that he willfully turned a blind eye, or that there were systemic policies or practices that Hinton condoned that led to the injury.  The record does not support a genuine dispute about any of these issues.  As to Hinton's personal involvement, the email correspondence and Hinton's testimony show that he followed his general practice in regard to Plaintiff's inquiries, which was to delegate the issue to subordinates and to review their responses.  Plaintiff suggests the responses were inadequate, but this bare assertion is not supported by any evidence that Dr. Hinton's review was inadequate.

The substance of the email inquiries shows that the Menard mental health staff engaged with Plaintiff on multiple occasions to discern his specific concerns and to offer treatment.  At the last contact in May of 2017, Dr. Butler reported that Plaintiff had refused to engage in at least five mental health sessions, so he was "PRN'd", which Dr. Hinton described as being scheduled for future care upon request.  Dr. Butler indicated that he wanted to transition out of segregation to general population with accommodations, but she was unsure exactly how that would work. Dr. Hinton testified

that the uncertainty centered on a housing decision, and that to-date, policies have been implemented to address that issue.  During the inquiry from February 2016-May of 2017 about Plaintiff's mental health/segregation inquiries to Dr. Hinton, Dr. Butler also corresponded with facility staff and Lawrence informed her that Plaintiff would not be moved out of segregation for security reasons.  On the available evidence, it is not clear what more Dr. Hinton could have done.  Deliberate indifference is not established if a provider or administrator took reasonable steps that failed to remedy a problem.

As to the more general argument, that Dr. Hinton allowed policies or practices to persist that harmed Plaintiff, Plaintiff has not provided enough evidence to support this secondary theory of deliberate indifference because a policy, pattern or practice claim generally cannot be established solely by reference to isolated incidents or issues. Plaintiff's evidence about the mental health implications of segregation is limited to his own experience.[27]  The evidence also shows that during the relevant time period for this litigation, from June of 2015 to date, there have been nearly constant changes to the mental health services and monitoring for segregated inmates, and new procedures have been established to target concerns in this area.  As the Seventh Circuit recently commented regarding the overall progress of improving mental health care in the IDOC, "It is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm."  *Rasho*, 22 F.4th at 711.  Dr. Hinton's deposition testimony, and the depositions of

---

[27] He offers generic evidence such as Dr. Grassian's reports and articles about segregation, but Plaintiff did not provide evidence about other inmates at Menard or in the IDOC.

many others in this case show that during the relevant time period the mental health care and the segregated housing situation in IDOC was under constant transition. That Dr. Hinton could have perhaps done more to intervene in this process or to expedite it, is not proof that he was deliberately indifferent to the overall situation.

In sum, based on the available record evidence, the Court finds that Plaintiff has not established a genuine dispute of material fact about Dr. Hinton's role in Plaintiff's care, either from a direct involvement perspective, or on a secondary theory about systemic problems. Summary judgment will be granted in favor of Dr. Hinton.

### v.    Fourteenth Amendment Procedural Due Process Claim

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that due process liberty interests prohibit restraints which impose an "atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Although prison inmates do not have a constitutional right to remain in general population, *see Lekas v. Briley*, 405 F.3d 602, 608–09 (7th Cir. 2005), in determining whether an atypical and significant hardship exists invoking due process, "both the duration and the conditions of the segregation must be considered." *Marion v. Columbia Correctional Inst.*, 559 F.3d 693, 698 (7th Cir. 2009). "[I]f the conditions of segregation were significantly harsher than those in the normal prison environment, then a year of [segregation] might count as a deprivation of liberty where a few days or even weeks might not." *Id.* (internal quotation omitted). The Seventh Circuit held in *Isby v. Brown*, 856 F.3d 508, 529 (7th Cir. 2017), that a period of ten years in segregation automatically constituted a deprivation of a liberty interest, which invoked a requirement for periodic review.

When a due process liberty interest is at stake, such as here, an inmate is entitled to "some informal, non-adversarial" procedures. *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012). Informal due process under these circumstances requires a periodic review of the placement determination at a frequency sufficient to ensure that "administrative segregation does not become 'a pretext for indefinite confinement.'" *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 477, n. 9 (1983)). The determination of the frequency of periodic review is committed to the discretion of prison officials. *Id.*; *see also Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) (120 day interval satisfied due process). In sum, "the requirements of informal due process leave substantial discretion and flexibility in the hands of the prison administrators." *Westefer*, 682 F.3d at 685.

The *Isby* Court explained that the periodic reviews should be evaluated using the three factors from *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). The factors are "(1) the private interest affected by a governmental decision, (2) the governmental interests at stake, and (3) the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards." *Isby*, 856 F.3d at 525. The *Isby* Court concluded that reviews were inadequate because they frequently parroted old reasons to keep the plaintiff in segregation without considering his disciplinary history over time. Other courts around the country have similarly concluded that "sham" reviews that rely primarily on the original reason for segregation as a continuing justification for segregation are insufficient. *See e.g.* *H'Shaka v. O'Gorman*, 444 F.Supp.3d 355, 373-375 (N.D. N.Y. 2020) (finding that there was a genuine dispute of fact about the adequacy of reviews for an

inmate's long-term segregation that lasted approximately 23 years after he attacked two guards with a razorblade). However, other courts have found that the government interest, and the prison's interest in safety and security may be enough to justify more than two decades of segregation, even if the segregation is continued on the same premise the whole time. *See Hope v. Harris*, 861 Fed. App'x 571, 580-81 (5th Cir. 2019) (finding that an inmate in segregation for 23 years with no chance of release was not deprived of due process because he had at least 48 hearings over the years, and Texas has a strong public interest in keeping the inmate segregated after an escape years ago, even after the inmate's 'escape risk' classification had been removed); *see also Kimble v. Boughton*, 2021 WL 3809904, at *18-19 (W.D. Wis. 2021) (finding that a warden who reviewed an inmate's administrative confinement status at regular intervals from 2017 to 2021, and justified ongoing confinement based past attack on guards, provided sufficient due process. Noted consultation with a medical professional during the ongoing confinement).

Plaintiff's term of segregation in this case lasted at least approximately 15 years, so like *Isby*, the duration of his segregation automatically invokes a liberty interest. That leaves the question of the adequacy of process afforded during periodic reviews, and the government interest at stake. The adequacy of reviews for Plaintiff is hard to assess because the frequency of reviews changed over the years, as did the procedures, and the types of review. Initially at Tamms, it appears Plaintiff got quarterly reviews at a local level, and then reviews every 120 days by the Deputy Director. Plaintiff was at Tamms only until sometime in 2012, so those reviews fall outside the statute of limitations and need not be considered in detail.

Once at Menard, Plaintiff again appeared to be receiving quarterly or bi-annual local reviews, with bi-annual reviews by the Deputy Director. It appears that on a few occasions a review might have been missed. For example, there is only one review document for July of 2016 (Doc. 280-4 at 25-27), and there is nothing for January of 2016. Plaintiff did not specifically single out this missed review as a reason that the process he was afforded was insufficient, and the record does not make it clear who would have been responsible for the missed review, so liability is not premised on this missed review.

In 2017, Plaintiff's file contains his first SMI segregation review form. The SMI segregation reviews added a second layer to the segregation review process, so in effect, they added to the process that was afforded because they did not replace the standard indeterminate segregation reviews that happened on a quarterly basis.

Against this landscape of review, the Court will briefly assess each review that Plaintiff had from June of 2015 thru 2020. On July 20, 2015, Plaintiff refused to be interviewed for the segregation review period, and his segregation was continued for "continued negative adjustment" with a note that he was disciplined for fighting on June 15, 2015. (Doc. 280-4 at 36-48). Given Plaintiff's non-participation in the process, as well as the rationale of continued poor adjustment, this review does not appear cursory and is supported by the record. (*Id.* at 48).

Plaintiff next refused to participate in the review process on July 26, 2016. The documents prepared for the review indicate that plaintiff was disciplined for fighting on November 27, 2015 and on May 28, 2016. (Doc. 280-4 at 25). Committee member Hart recommended that segregation be continued based on the nature of the offense, and

Butler approved without comment.  This review is similar to the cursory reviews discussed in *Isby* because continued segregation is premised solely on the underlying offense, which was nearly ten years old at that point.  However, in addition to the old conduct that was relied on by the Hart and Butler, there were also new incidents of fighting, and Plaintiff refused to participate in the process.  In light of this evidence, the constitutional sufficiency of the review is genuinely disputable.

In preparation for the January 2017 review, Plaintiff gave a statement that he did not "want out of seg [but] would like a seg out date to work towards."  (Doc. 280-4 at 24).  He further stated, "I have been in seg for 10 yrs don't know if I can make in population or with a cellie.  I need counseling, and I have been taking meds."  (*Id.*).  The segregation committee (including Hart) recommended continued indeterminate segregation based on Plaintiff's own statement he cannot make it in population, and Lashbrook approved.  The supporting documents show that at the time of review, Plaintiff's last discipline was a July 2017 ticket for intimidation or threats.  This review is not constitutionally infirm for simply parroting an old reason to keep Plaintiff in segregation, but the substance of the reason for keeping him in segregation could be questioned, so there is a genuine dispute about this review.

Again in July of 2017, Plaintiff stated he "would love to come out of segregation," but the committee, which included Hart, continued him in segregation with no reason

given.  Lashbrook approved without comment.[28]  As with reviews in *Isby*, this review appears cursory at best.  (Doc. 280-4 at 20).

In October of 2017, Plaintiff refused to attend the review or to give input, and he was continued in segregation for his refusal to participate.  (Doc. 280-4 at 15).  Hart and Lashbrook participated in this review.  A reasonable jury could debate whether this review afforded sufficient process, or if it was too cursory to simply hinge the outcome on Plaintiff's refusal to participate, so a genuine dispute exists about the sufficiency of this review.

In March 2018, Plaintiff again refused to participate, and his segregation was continued based on the "nature of the offense."  The review was signed by Hart, Lashbrook, and Deputy Director Mueller[29].  This review is cursory under the standards of *Isby*.  In July of 2018, Plaintiff stated he was ready to leave segregation and he had not received a ticket in nearly two years.  It was noted that he was designated as SMI.  Despite this information, the committee noted he had a history of violent or aggressive behavior towards staff and recommended that segregation continue.  (Doc. 280-4 at 7).  Lashbrook and Mueller approved without comment.  (*Id*.).  As with the March 2018 review, this review could be considered cursory, especially in light of Plaintiff's statement he had no new discipline for nearly two years.

---

[28] Lashbrook signed off on a June 29, 2017, SMI segregation review and noted Plaintiff's discipline had improved, but he was not compliant with his mental health plan.  Based on these comments, she approved no changes to indeterminate segregation.  (Doc. 280-4 at 16).

[29] On October 20, 2022, the Defendants filed a notice of suggestion of death (Doc. 308) as to Defendant Robert Mueller.  Per Fed. R. Civ. P. 25(a)(1), if a motion to substitute is not made within 90 days after service of the notice of death, then the action against the deceased must be dismissed.  The Plaintiff did not respond in any fashion to the suggestion of death and 90 days have now lapsed, so dismissal of the claim against Mueller is appropriate.

At the March 2019 review, Plaintiff again requested the end of segregation, but the committee (Schoenbeck and Walker) recommended that he be continued because "proper discipline was administered." Lawrence and Deputy Director Eilers concurred without comment. (Doc. 280-5 at 74). The reason given for continued segregation could be considered cursory. A review that spanned December 2019 to January of 2020 reached the same conclusion with the same rationale given. The review was signed by Schoenbeck, Walker, Lawrence, and Deputy Director Simmons. (Doc. 280-5 at 56). As with the March review, this could be considered cursory because no new or additional rationale was provided, and Plaintiff expressed a desire for a change in his status. The Court notes that as to these two reviews—by the time of the March 2019 review, Plaintiff had been transitioned to "long-term" segregation with an out-date of July 30, 2026. The Court also notes that by the time of the December 2019/January 2020 review, Plaintiff had received discipline for flooding his cell, and making threats to officials. (Doc. 280-5 at 65-66, 75-76). Although the committee did not discuss these events, they may have considered them.

The long-term segregation review that spanned March and April of 2020 contained the exact same reasoning as the January 2020 review. Namely, Plaintiff sought an end to segregation, but the committee (Schoenbeck and Walker) found that "proper discipline was administered." (Doc. 280-5 at 52). Warden Wills (a non-party) suggested six months reduction to release prior to MSR,[30] and noted no significant discipline since April of

---

[30] This comment does not make sense because MSR typically stands for mandatory supervised release but Plaintiff is serving a life sentence without the possibility of parole. At this segregation review, Plaintiff's segregation out date

2019.  Simmons approved without comment.   Schoenbeck and Walker's rationale was a carbon copy of earlier reviews, so this review could be characterized as insufficient.

By the June 2020 segregation review period, Plaintiff's segregation term was inexplicably reduced from a release date of July 30, 2026, to December 15, 2020.  (*Compare* Doc. 280-5 at 51 *with* 23).   Schoenbeck and Walker wrote, "Committee recommends continued placement in segregation.  I/M Wallace has received a significant segregation time cut within the last 90 days.  I/M Wallace also has been found guilty of two DR's for aggressive behavior towards other inmates in the last 90 days.  Committee recommends more observation."  (Doc. 280-5 at 24).  Warden Wills commented, "disciplinary history w/offender assault during this reviewing period, needs more observation."  (*Id.*) Simmons approved without comment.  This review of Plaintiff's long-term segregation is detailed and is justified by the identified disciplinary history.  This review is constitutionally sufficient.

Plaintiff was reviewed again in September of 2020 by committee members Schoenbeck and Walker, who made in essence the same recommendation as the June recommendation.  (Doc. 280-5 at 8).  Wills concurred with the comment that due to the 5/23/20 assault of an offender, more observation was needed, and Simmons concurred without comment.  The sufficiency of this review is debatable, although it reiterates the same reasons for continued segregation as the last review, it relies on a fight that occurred

---

was July 30, 2026, but by the next review in June of 2020, his out date was December 15, 2020, so it is not clear what if anything came of Wills' suggestion.  (Doc. 280-5 at 51-52, 23-24).

within a four-month period, which could arguably give justification for continued observation.

On the whole, some of the indeterminate/long-term segregation reviews were detailed and constitutionally adequate, while the sufficiency of other reviews could be debated by reasonable jurors. Based on the above discussion of each review, the Court finds that there are genuine disputes of fact about the sufficiency of reviews in July 2016, January 2017, July 2017, October 2017, March 2018, July 2018, March 2019, December 2019- January 2020, March 2020-April 2020, and September of 2020. Participants for these reviews were Defendants Butler, Hart, Lashbrook, Schoenbeck, Walker, Lawrence, Eilers, and Simmons. Accordingly, a procedural due process claim may proceed against these defendants for their alleged participation in the above-listed reviews.

This leaves Defendants Jeffreys, Jones, Rathke, Hill, Westfall, and Goldman. There is no allegation that Jeffreys ever directly participated in the indeterminate or long-term segregation reviews, nor was his approval required on the findings of these reviews. The Court also notes that on many segregation review documents in the file, Jeffreys was not listed as the Director of the Illinois Department of Corrections. On an Adjustment Committee document dated June 4, 2019, John Baldwin was listed as the Acting Director. The first time Jeffreys name appears is on an April 28, 2020 Adjustment Committee document. (Doc. 280-5 at 45). The parties do not specifically acknowledge when Jeffreys became involved in matters relevant to this case, but from the record available, it appears that he was Acting Director for very little of the relevant time period. Based on the scant evidence available about Jeffreys, the Court cannot conclude that he was personally

involved in a procedural due process violation. Claim 3 against Jeffreys in his individual capacity will be dismissed, but Jeffreys is also named in the ADA and Rehabilitation Act claims, so he will be discussed further later.

As to Defendants Rathke, Westfall and Hill, and Goldman, Plaintiff alleged in his Fourth Amended Complaint that these four served on the SMI segregation review committee. There is no evidence that clearly shows Rathke or Westfall's name, and there is just one document signed by Goldman. On March 8, 2018, Goldman signed off on Plaintiff's SMI Segregation review which had written comments "based on a review of the mental health file and in consideration of I/M's diagnosis and IDR's it is recommended I/M receive no seg cuts at this time." (Doc. 280-4 at 12). This is the second SMI segregation review Plaintiff received, and this review did not offer novel reasons for the continuation of segregation. As the Court noted above, because this procedure was added as a supplemental review to ordinary indeterminate segregation reviews, it is possible that this process itself did not give rise to an additional liberty interest. At most, there is a material question about whether this review created a separate liberty interest, and if Goldman's participation constituted a cursory review such that Plaintiff was deprived the process he was due.

Defendant Hill was named on two of the SMI segregation review forms. She completed the first ever SMI segregation review for Plaintiff on June 29, 2017, which contained detailed notes about a review of Plaintiff's mental health file and discipline. (280-4 at 16). The review was signed by Warden Lashbrook who noted that Plaintiff's disciplinary behavior had improved, but his mental health compliance was lagging. As

the first ever review of this sort, and as a supplemental review to indeterminate segregation reviews, the Court finds that Hill and Lashbrook's participation in this first SMI segregation review did not deprive Plaintiff of process, nor did it merely parrot past observations, because it was the first review of this kind.  Hill also participated in a July 2018 SMI segregation review, at which time she recommended a one-month reduction of segregation time, but no change to indeterminate segregation.  (Doc. 280-4 at 3).  Based on Hill's recommendation that the segregation time be reduced in some fashion, it cannot be said she failed to meaningfully engage in this process.  Plaintiff has failed to establish a genuine dispute about Hill's participation.

As to Defendant Jones, his signature is on one SMI review as Warden.  As noted above in relation to the conditions of confinement claim, in his one SMI review, Jones granted a segregation reduction.  There is not sufficient evidence to suggest that Jones' limited role violated Plaintiff's right to procedural due process.

Based on the analysis of Hill, Goldman, Westfall, Rathke, and Jones, the Court finds that there is insufficient evidence to establish a dispute that any of these four individuals deprived Plaintiff of procedural due process, summary judgment will be granted in favor of these four defendants on Claim 3.

### vi.    Fourteenth Amendment substantive Due Process Claim

The Defendants argue that Plaintiff's substantive due process claim is more properly considered under the Eighth Amendment and the procedural due process analysis of the Fourteenth Amendment.  Plaintiff concedes that the standards under the Eighth Amendment analysis are determinative.  (Doc. 285 at 24, n. 10).  Given the parties

agreement that this theory is more properly considered under the Eighth Amendment, Claim 4 concerning substantive due process is dismissed.

### vii.   ADA/RA Claims

The Defendants argue that the only proper Defendant for the ADA and RA claims (Claims 5 and 6) is Rob Jeffreys, because the only proper defendant for such a claim is an agency or its director in official capacity.   The Defendants are correct that the proper defendant for the ADA and RA claims is the current director of IDOC.  *See Bradley v. Baldwin*, Case No. 19-cv-205-NJR, 2019 WL 1953962, at * 4 (S.D. Ill. 2019) (dismissing ADA and RA claims against prison warden).   Accordingly, the ADA and RA claims will be dismissed as to Simmons, Mueller, Eilers, Williams, Hinton, Lawrence, Butler, Lashbrook and Jones.

Defendants further argue that Plaintiff cannot make out a proper ADA or RA claim, because in essence in this claim he is just making a second attack on the adequacy of the mental healthcare he received, and an attack on the adequacy of care is not valid under the ADA or RA.  Plaintiff counters that, his claim is not about the treatment he received, rather, "his claim is that by placing [him] in prolonged segregation, even after it became clear that he had become seriously mentally ill and that segregation was causing and aggravating his serious mental health issues, the IDOC Defendants failed to provide a reasonable accommodation for him that would not cause him to suffer further." (Doc. 285 at 25).  Plaintiff does not support his theory by reference to any precedent.

As to the substance of these claims, to state an ADA or RA claim, a plaintiff must allege that "(1) he is a qualified person, (2) with a disability, and (3) the Department of

Corrections denied him access to a program or activity because of his disability." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). A plaintiff can also pursue an ADA or RA claim on the theory that the prison failed to accommodate a need, and that such failure to accommodate deprived him of services or programs offered by the prison. *See e.g. Price v. Illinois Department of Corrections,* 2022 WL 1016558, at * 2-3 (N.D. Ill. 2022) (describing a failure to accommodate claim under the ADA and RA).

The parties do not address whether Plaintiff's mental state constitutes a disability, but the court will assume for purposes of this analysis that his mental state is sufficient to constitute a disability. Defendants focus on the characterization of Plaintiff's claim as a claim for different treatment, which is not allowable under the ADA or RA. *See e.g. Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (the ADA does not create a remedy for a medical malpractice claim, or for a claim about incompetent treatment of a condition). But Plaintiff argues that his claim is not about treatment, rather it is about a failure to accommodate his mental disability. Although a failure to accommodate is a viable theory under the ADA or RA, the Court does not find that Plaintiff's claim fits this characterization.

Plaintiff's argument is flawed. He argues that the Defendants created his mental disability by placing him in prolonged segregation, and then they failed to accommodate his dwindling mental health by keeping him in segregation *because of* his mental health. Plaintiff was originally placed in segregation for discipline and to maintain safety and security. Plaintiff has not identified any specific evidence that shows he was kept in segregation because of his mental health, either when he was first placed or later when

he was kept segregated.  Thus, Plaintiff was not housed in segregation because of his

disability, and he was not deprived of services or programs *based on* his disability.[31]

As for the theory that the defendants failed to accommodate his deteriorating

mental health, Plaintiff has not identified clear evidence of what accommodations might

have been appropriate.  Plaintiff received ongoing mental health treatment, and he was

ultimately afforded a tapered program that has transitioned him out of segregation to a

custodial status with greater privileges.  This progression tends to suggest that

accommodations were made for Plaintiff, rather than that accommodations were denied.

Ultimately, Plaintiff's claim fails at this juncture because, as the Defendants indicated, he

cannot maintain a claim for inadequate care, and he has not clearly defined the scope of

a failure to accommodate.  Based the above analysis, the Court finds that Plaintiff has not

---

[31] Although not a perfect analogy, the Court finds that Plaintiff's argument has flaws similar to the ADA/RA claims considered by the Ninth Circuit Court of Appeals in *O'Guinn v. Nevada Dept. of Corrections,* 468 Fed. App'x 651 (9th Cir. 2012). In *O'Guinn* the Court considered ADA an RA claims by an inmate who claimed that he was disabled by way of mental disability, and he was discriminated against because of his mental disability and excluded from programming that could have provided treatment.  The Court found that the inquiry about whether plaintiff was a qualified person was inextricably intertwined with the inquiry of if he was discriminated against.  *Id.* at 653.  The Court noted that some of Plaintiff's reasoning created a flawed inferential chain: because he was untreated, he committed misconduct; because of his misconduct he was disciplined…but "he failed to produce evidence showing that the disciplinary action was on account of his disability—rather than on account of his misconduct[.]"  Additionally, plaintiff argued that because of his disability he was unaware of available treatment programs, which the Court also found to be an unsupported inferential chain.

Like the scenario in *O'Guinn,* this Court finds that Plaintiff has created an inferential chain that does not properly support an ADA or RA claim.  Notably, Plaintiff alleges he developed mental infirmities because of ongoing segregation, and defendants failed to accommodate segregation to abate the mental infirmities that it created.  This inferential chain completely omits the notion that Plaintiff was kept in different forms of restrictive custody for institutional safety and security reasons, that may not have afforded other options.  The record shows that Plaintiff received mental health services and he received opportunities to contest his housing placement.  The record does not show that Plaintiff ever sought a change in placement premised specifically on his mental health until he commenced litigation, nor does it show that he always sought a release from segregation.

stated a proper claim under the ADA or RA, so summary judgment will be granted in favor of Rob Jeffreys in his official capacity on these claims.

### viii.   Qualified Immunity

The Defendants argue that to the extent that any of the claims may proceed beyond summary judgment, they are entitled to qualified immunity because none of the issues that arose in this case are clearly established by existing precedent.  Plaintiff counters that qualified immunity does not apply if based on the preexisting law, it is evident that conduct violates the law, even if the factual circumstances supporting the violation are novel.

Here, the Court has only allowed the procedural due process claim to proceed against a select group of defendants that were personally involved, and it has dismissed all five other claims.   Procedural due process is clearly established, and even the procedural due process analysis for terms of segregation applicable to this case under *Isby*, 856 F.3d at 529-530 has been around for a significant portion of the time disputed in this lawsuit.[32]  Accordingly, like the Seventh Circuit concluded in *Isby*, this Court finds that the factual disputes about procedural due process identified above preclude summary judgment on the basis of qualified immunity.

### ix.   Conclusion

---

[32] The Defendants cited *Isby* for the opposite proposition that under currently established law, the rights at issue in this case are not clearly established, but the citation is misleading.  The portion of *Isby* that they cite related to the conditions of confinement analysis, and in that analysis the Seventh Circuit did not directly discuss qualified immunity, so *Isby* is not persuasive as cited by Defendants in relation to qualified immunity.  The Defendants also cited *Giles*, 914 F.3d at 1052, for the proposition that the Seventh Circuit has found continued segregation did not create an excessive risk to an inmate's health where mental health professionals continuously advised there was no risk, but there is not such clear evidence in this case, so *Giles* is similarly unpersuasive in this context at the summary judgment juncture.

Based on the foregoing analysis, the Court finds that it is appropriate to grant summary judgment on all claims other than the procedural due process claim against a select group of defendants.  Plaintiff spent many years in segregation, during which time his mental health arguably deteriorated, but the Defendants were not without reason to place him there, nor did they do so without giving thought to their actions.  The deposition testimony reflects the reality that prison administrators must balance many important interests and needs in the management of the institution.  Prison officials and employees have an important interest in institutional security, which cannot be forgotten in this case.  Many years have passed, but when Plaintiff was originally incarcerated he attacked two guards within the span of a few years.  In the intervening years, he has been disciplined for fighting, and as recently as 2019, he was disciplined for sending threats to public officials.  The Court also notes that Plaintiff's participation in mental health services has been intermittent, and his own expressed desires about his living situation have fluctuated.  In 2016 correspondence he first requested a release from segregation to general population, and by 2017, he requested protective custody or a tapered release from segregation.  Much like the *Isby* plaintiff, to some extent, Plaintiff's tenure in segregation was driven by his own conduct, and his own choices regarding treatment options.

As the Seventh Circuit recently noted in review of injunctive relief in the *Rasho* litigation, "[i]t is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm."  22 F.4th at 711.  The Court concludes that many of the claims in this case

fall within the rationale expressed by the *Rasho* Court.  In an ideal world, more might have been done about Plaintiff's segregation, and it might have been done faster, but the very existence of a better ideal does not establish that the Defendants' recklessly disregarded Plaintiff's needs.

Plaintiff's Motion for a Hearing (Doc. 304) will be denied because the Court found the record sufficient to resolve the claims without hearing.  Local Rule 7.1(h)(4).

### DISPOSITION

The Motion for Summary Judgment (Doc. 280) filed by all IDOC Defendants is **GRANTED** in part and **DENIED** in part.  Summary judgment is **GRANTED** as to claims 1 (conditions of confinement), 2 (adequacy of mental health care), 4 (substantive due process), 5 (ADA), and 6 (RA).  This resolves all claims against Defendants Williams and Hinton, so the Clerk of Court is **DIRECTED** to terminate these parties and to enter judgment in their favor at the close of this case.  Summary judgment is **GRANTED** in part on Claim 3 (procedural due process) in favor of Defendants Jeffreys, Jones, Rathke, Hill, Westfall, and Goldman, and is **DENIED** in part as to Defendants Simmons, Eilers, Lawrence, Lashbrook, Butler, Schoenbeck, Hart, and Walker.  This resolves all claims against Jones, Rathke, Hill, Westfall, and Goldman, so the Clerk of Court is **DIRECTED** to terminate these parties and to enter judgment in their favor at the close of the case.

The procedural due process claim against Defendant Mueller is dismissed per Fed. R. Civ. P. Rule 25(a)(1), because a suggestion of death was filed on October 20, 2022 (Doc. 308), and more than 90 days have lapsed without Plaintiff moving to substitute anyone for this claim.

Defendants' Motion to Strike (Doc. 301) is **DENIED**.

Plaintiff's Motion for a Hearing (Doc. 304) is **DENIED**.

Defendant Jeffreys shall remain in this lawsuit in his official capacity solely for the purpose of effectuating any potential injunctive relief.  If necessary, the current Warden (Anthony Wills) and the current Deputy Director (Kim Smith) may also be added later per Fed. R. Civ. P. Rule 25(d) to effectuate injunctive relief.  Additionally, the official capacity claims may remain against Defendants Lawrence, Schoenbeck, Hart, and Walker, because it is possible these defendants could have a role in implementing injunctive relief.

**IT IS SO ORDERED.**

Dated: February 20, 2023

_____
DAVID W. DUGAN
United States District Judge